Timothy RYAN, Plaintiff,

v.

BURLINGTON COUNTY, et al., Defendants.

Civ. A. No. 85–2002.

United States District Court,
D. New Jersey,
Civil Division.

Nov. 9, 1987.

Slimm, Dash and Goldberg by Joseph Goldberg, Westmont, N.J., for plaintiff.

W. Cary Edwards, Atty. Gen. of N.J. by Douglass L. Derry, Deputy Atty. Gen., Trenton, N.J., for defendants William H. Fauver and Joseph G. Call.

Kummer, Knox & Naughton by Stephen R. Knox, Parsippany, N.J., for defendant Michael J. Hogan.

## OPINION

BARRY, District Judge.

On October 3, 1983, plaintiff Timothy Ryan was a pretrial detainee in the Burlington County Jail.[1] He was a healthy, fully functioning human being capable of the things human beings take for granted. He could walk, feed himself, go to the bathroom on his own, and make love. On October 4, 1983, Timothy Ryan was rendered quadriplegic. The person who caused this injury, Michael Scott, was Ryan's cellmate and a criminal convicted of a crime involving death or injury to another. On October 4, 1983, Scott was awaiting transfer to a state run facility as a parole violator, and had been waiting for 58 days during which time he was involved in several violent attacks on other inmates.

This tragedy occurred despite a federal consent decree ordering the classification of prisoners as well as the capping of the number of inmates at eight instead of the ten housed in Ryan's cell on October 4, 1983. It occurred despite an Executive Order by the Governor of New Jersey authorizing the Commissioner of the Department of Corrections to take whatever steps he deemed necessary to efficiently allocate inmates of both state and county facilities to relieve the pressures caused by overcrowding.

The moving defendants, as discussed below, are not guilty of wholly disregarding the overcrowding pervasive in the state and county prisons. Indeed, the record is replete with special reports, letters, and memoranda detailing efforts to relieve this problem. Nevertheless, the record convinces me that the conditions at the Burlington County Jail on October 4, 1983 were the product of a system in which no one assumed ultimate authority. The county officials determined that the county was compelled to comply with state requests. The state officials, while overburdening the county prisons with state inmates, did nothing to assure themselves that those county facilities could handle the overload despite the fact that the same Executive Order which authorized the state officials to use county prisons also entrusted those officials with greater responsibility for those same facilities. And Ryan was gravely injured.

---

1. The Complaint alleges that plaintiff was stopped by the Medford Township Police on September 30, 1983 for a motor vehicle violation and was held pursuant to a warrant issued by Mt. Laurel Township arising out of a motor vehicle violation on April 1, 1983.

Ryan brings this action pursuant to 42 U.S.C. §§ 1983 and 1985 alleging that numerous defendants, including Burlington County; the Burlington County Board of Chosen Freeholders ("Freeholders"); the Warden of the Burlington County Jail; other prison guards and officials; William H. Fauver, the Commissioner of the Department of Corrections; Joseph G. Call, Deputy Director, Division of Adult Institutions; the Burlington County Solicitor's Office; and Michael J. Hogan, the part-time Solicitor of Burlington County; have violated his constitutional rights under the Fourth, Fifth and Fourteenth Amendments.

On November 13, 1985, defendants Fauver and Call filed a motion to dismiss the complaint and all cross-claims against them or, in the alternative, for summary judgment. On December 13, 1985, I ordered that these defendants be deposed and reserved on the motion pending further discovery. In the interim, defendant Hogan moved for summary judgment. Discovery having now been completed, this opinion resolves both motions.

Essentially, the motions before me raise related questions which may be summarized as follows:

(1) What constitutional rights, if any, did plaintiff enjoy on October 4, 1983 when he was rendered quadriplegic?

(2) Are these defendants immune under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)?

(3) Is plaintiff's claim actionable under *Davidson v. O'Lone,* 752 F.2d 817 (3d Cir. 1984) (*en banc*), *aff'd sub. nom., Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) and *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)?

(4) If plaintiff has a claim for a violation of his constitutional rights, was plaintiff's injury proximately caused by the acts or omissions of any of these defendants?

In order to answer these questions, it is necessary to first recount in some detail the facts relating to the administration of state prisons in New Jersey, the history of the Burlington County Jail, and the role of each of these defendants.

### *The New Jersey Statutory Scheme*

New Jersey maintains a parallel system of incarceration. Pursuant to N.J.S.A. 2C:43-10(a), with certain exceptions not relevant here, a person sentenced to a term of one year or more is committed to the custody of the Commissioner of the Department of Corrections. A person sentenced to less than one year is committed "either to the common jail of the county, the county workhouse or the county penitentiary for the term of his sentence and until released in accordance with law." N.J.S.A. 2C:43-10(c). Responsibility for county jails is generally under the control of the county sheriff, N.J.S.A. 30:8-17, 18, unless the County Freeholders resolve to "assume and thereafter to exercise the custody, rule, keeping and charge of the county jails in their respective counties, and of the prisoners therein...." N.J.S.A. 30:8-19.

Despite this dual system of incarceration, the Commissioner of the Department of Corrections is directed to "[p]romote a unified criminal justice system, including the integration of State and local correctional programs and probation and parole services." N.J.S.A. 30:1B-6(*o*). Indeed, the declared purpose of the Department of Corrections is "to protect the public and to provide for the custody, care, discipline, training and treatment of persons committed to State correctional institutions or on parole" as well as "to supervise and assist in the treatment and training of persons in local correctional and detention facilities, so that such persons may be prepared for release and reintegration into the community ..." N.J.S.A. 30:1B-3. The Legislature further declared that "[t]he incarcerated offender should be protected from victimization within the Institution." N.J.S.A. 30:1B-3(c). It is understood that all persons sentenced to a term of imprisonment for a term of one year or more will be placed in the custody of the sheriff of the appropriate county who is obliged by law "within 15 days [to] transport him to the State Prison and there deliver him into the custody of the Commissioner of the Depart-

ment of Corrections...." N.J.S.A. 2C:43–10(e).

Pursuant to its authority to supervise the county jails, the Department of Corrections in 1979, under the direction of defendant Fauver, promulgated a Manual of Standards for New Jersey Adult County Correctional Facilities. Exhibit P–2 to Plaintiff's Appendix in Opposition to Fauver and Call's Motion to Dismiss (the "County Manual"). *See also* February 26, 1986 Deposition of William H. Fauver at 49. The County Manual "defines the minimum criteria for the various functions and operations of county correctional facilities." *Id.* at 2. It also recites the basis for the Commissioner's authority to create these standards, N.J.S.A. 30:1B–10, which provides:

All functions, powers, and duties of the Commissioner of Institutions and Agencies and the Department of Institutions and Agencies with respect to all county and city jails or places of detention, county or city workhouses, county penitentiaries, county and municipal schools of detention, privately maintained institutions and non-institutional agencies and juvenile detention facilities for the care, treatment, government, and discipline of inmates are hereby transferred to the Department of Corrections ... The commissioner may ... promulgate such rules and regulations as he shall deem necessary to establish minimum standards for such care, treatment, government and discipline.

Of significance to this case is the requirement promulgated by the Department of Corrections and contained in the County Manual that there shall be separate management of inmates distinguishing *inter alia* between pretrial detainees and convicted prisoners and between aggressive inmates and passive/independent inmates. *Id.* at 28. Classification was a goal and obviously important. The design of facilities under construction must accomplish this goal. *Id.* at 2, 6.

Inexplicably, the statutory scheme does not authorize the Commissioner or the Department of Corrections to enforce these regulations. The Department does inspect county facilities, Fauver Dep. at 26, 28, but *"prior* to the executive order [the Department] would have to go to a court to enforce any recommendations that we felt were important enough that should be addressed." *Id.* at 28 (emphasis added).

### *The Governor's Executive Order*

On June 2, 1981, then Governor of New Jersey Brendan T. Byrne signed Executive Order No. 106. This order stated in relevant part:

WHEREAS, the State Prisons and other penal and correction institutions of the New Jersey Department of Corrections are housing populations of inmates in excess of their capacities and are seriously overcrowded as a result of unusually large numbers of commitments to the State institutions and commitments for terms of years which are longer than heretofore imposed; and

WHEREAS, the Department is physically unable to accept from the Sheriffs of the various counties the custody of inmates sentenced to the custody of the Commissioner of the Department of Corrections, as mandated by N.J.S.A. 2C:43–10(e); and

WHEREAS, many county penal institutions of the various counties are also presently overcrowded and are housing inmate populations in excess of their capacities while other county penal institutions have available space for additional inmates; and

WHEREAS, there is a *need to efficiently allocate inmates of state and county penal and correctional institutions to those institutions having available space in order to alleviate overcrowding;* and

WHEREAS, the New Jersey Correctional Master Plan recommended the coordination of resources for jail operation and services by the State, while the jails remain under local jurisdiction; and

WHEREAS, these unusual conditions endanger the safety, welfare and resources of the residents of this State, and threaten loss to and destruction of

property, and are too large in scope to be handled in their entirety by regular operating services of either the counties or the New Jersey Department of Corrections;

NOW, THEREFORE, I, BRENDAN T. BYRNE, Governor of the State of New Jersey, by virtue of the authority vested in me by the Constitution and laws of the State of New Jersey, do hereby DECLARE a state of emergency and ORDER and DIRECT as follows:

1. I DECLARE, that a state of emergency exists in the various State and County penal and correctional facilities by reason of facts and circumstances set forth above.

\* \* \* \* \* \*

3. I hereby DIRECT that the *authority* to designate the place of confinement *of all inmates* confined in *all State and County* penal or correctional institutions shall be exercised for the duration of this Order by the designee of the Governor.

4. I hereby designate the Commissioner of the Department of Corrections to effectuate the provisions of this Order.

5. The Commissioner may designate as a place of confinement any available, suitable, and appropriate institution or facility, whether owned by the State, a County, or any political subdivision of this State, or any other person, *for the confinement of inmates confined in the State and/or County* penal or correctional institutions.

6. When it appears to the *satisfaction of the Commissioner that an inmate should be transferred* to a penal or correctional institution or facility of the *State or the various Counties* more appropriate for his needs and welfare, *or that of other inmates,* or the security of the institution in which he has been confined he shall be authorized and empowered to designate the place of confinement to which the inmate shall be transferred.

\* \* \* \* \* \*

8. I further ORDER that the *authority* of the Commissioner to *designate the place of confinement* of any inmate may be exercised when deemed appropriate by the Commissioner regardless of *whether said inmate has been sentenced or is being held in pretrial detention* except that only persons sentenced to a prison or committed to the custody of the Commissioner may be confined in a State Prison.

9. The *Commissioner* of the Department of Corrections shall have *full authority* to adopt such rules, regulations, orders and directives as he shall deem necessary to effect the above provisions. (emphasis added).

This Executive Order was continued by Governor Byrne and later by Governor Thomas H. Kean and was in effect in October, 1983. July 15, 1983 Executive Order No. 43.

Three days before Governor Byrne issued Executive Order No. 106, a County Executive and the Sheriff of Atlantic County filed an action to compel the Commissioner to accept within 15 days, pursuant to N.J.S.A. 2C:43–10(e), prisoners from Atlantic County who were sentenced to terms of one year or more and, thus, to state institutions. The Appellate Division of the Superior Court of New Jersey held, on September 4, 1981, that Executive Order No. 106 was valid. *Worthington v. Fauver*, 180 N.J.Super. 368, 434 A.2d 1134 (App.Div. 1981). The majority emphasized that the case illustrated the need "for centralization of the authority" over both county and state penal institutions to control overcrowding at both "our county jails and state prisons." *Id.* at 371, 434 A.2d 1134.

Judge Joelson, in dissent, argued that the Executive Order was an improper invasion by the executive into the province of the legislature and that, as implemented by the Commissioner, it was arbitrary, capricious, and unreasonable. "It is not reasonable for state officials to dump their problems on county officials who already have the same or worse problems." *Id.* at 389, 434 A.2d 1134 (Joelson, J., dissenting).

On appeal, the Supreme Court of New Jersey unanimously affirmed. 88 N.J. 183,

440 A.2d 1128 (1982). Noting the problems caused by overcrowding, Justice Pashman stated:

It is commonly acknowledged that overcrowding in prisons causes grave problems. Rehabilitative programs and recreation become disrupted or nonexistent. *As crowding increases, frustration and anger emerge, causing tempers to flare and fights to erupt.* Lack of space makes it difficult if not impossible to segregate prisoners for disciplinary and other purposes. Overcrowding can contribute to riots.

*Id.* at 188–89, 440 A.2d 1128 (emphasis added).

In finding the Executive Order valid, the Supreme Court noted that the "centralization of power to allocate prisoners among the various state and county facilities is a rational means of alleviating the problem of overcrowding in our prisons." *Id.* at 201, 440 A.2d 1128. What was significant was the apparent understanding of the Supreme Court that Executive Order No. 106 was meant not only to alleviate state overcrowding but also county overcrowding. "The record below demonstrates that *our state and county facilities* may be dangerously close to producing such a disaster [of substantial loss of property or life]. The prevention of such an occurrence is clearly a proper subject of executive emergency action under the statute." *Id.* at 196, 440 A.2d 1128 (emphasis added). And, in an indirect response to Judge Joelson's argument that Executive Order No. 106 was the dumping of a state problem onto the counties, Justice Pashman noted actions taken by the Commissioner to reduce overcrowding at the county jails. *Id.* at 205, 440 A.2d 1128.

Significantly, despite the favorable ruling in *Worthington* and for reasons not provided to this court, in 1982 the Department of Corrections entered into two consent judgments with Essex and Camden counties in suits similar to *Worthington.* In *Essex County Jail Inmates v. Collier,* Civ. No. 82–1945 (D.N.J. Oct. 18, 1982) (Ackerman, J.), the Commissioner agreed to remove three hundred state prisoners housed in Essex County Jail over a two and one half month period and agreed that, after July 1, 1983, any and all state sentenced inmates who caused the Essex County Jail population to exceed 594 would be removed within 15 days. Consent Judgment attached as P–63 to Plaintiff's Appendix Opposing Fauver and Call's Motion to Dismiss. In *Camden County Jail Inmates v. Parker,* Civ. No. 82–1946 (D.N.J. Nov. 18, 1982) (Ackerman, J.), the Commissioner agreed to remove all inmates sentenced to imprisonment in state facilities by removing them from the Camden County Jail within 15 days. This consent judgment also noted that as a result of the overcrowding at Camden County Jail there was no "adequate classification program which insures that inmates are held in the least restrictive circumstances necessary to insure their presence at trial and the maintenance of institutional security ... *which protects each inmate's right to personal security.*" Consent Judgment at 3 attached as P–64 to Plaintiff's Appendix Opposing Fauver and Call's Motion to Dismiss.

Prior to these consent decrees, on December 3, 1981 a special Governor's Task Force, of which defendant Fauver was a member, issued a Report on Prison Overcrowding. This Report described the then existing situation of overcrowding and noted that the picture became "truly ... startling" when one considers the fact "that prison officials believe that in order to most efficiently and safely operate prison facilities, they should operate at 92% of operational capacity ..." and the fact that a rapid rise in the number of state prison inmates was forecasted. Report at 3 attached as P–104 to Plaintiff's Appendex Opposing Fauver and Call's Motion to Dismiss. Moreover, "[t]he prolonged use of total bedspaces within an institution could lead to significant management control problems and increase the potential for serious disruptions." *Id.* at 13.

The Report touched briefly on the particular problem of county facilities. "The county jail overcrowding problem ... is a direct result of the [state] prison overcrowding situation." *Id.* at 34. According-

ly, one of the issues on which the task force concentrated was ascertaining whether the state facilities met minimum standards "with respect to those awaiting trial, *in terms of the Federal Constitution's Fourteenth Amendment's requirement of due process ..." Id.* at 12 (emphasis added). Continuing, the Report explained:

> From the constitutional perspective, the following factors were considered: (1) *Overcrowding* (sanitation, recreation, space, etc.); (2) Availability of medical treatment; (3) *Protection of the physical safety of inmates;* (4) Access to the courts—including legal consultation and library access; and (5) Overall prison management.

*Id.* at 12 (emphasis added).

Finally, prior to making specific recommendations, only one of which directly impacted on county inmates, the Task Force reported that in November, 1981, the state institutions were running at 102% capacity, a percentage which did not include the 960 state inmates being housed in county facilities. At the same time, the county facilities were running at 121% capacity. Had the 960 state holdovers been transferred out of the county facilities, those facilities would have been running at 101% capacity and the state facilities would have been running at 122% capacity.

### The Burlington County Jail

As described in a report based on a September 18, 1980 inspection, the Burlington County Jail (the "county jail") is a small two story building located in Mount Holly, New Jersey. Inmates are housed on both floors—the first floor is entirely dormitory housing; the second floor is a mix of dormitory and individual cell housing. *See* Exhibit J in Plaintiff's Appendix Opposing Fauver and Call's Motion to Dismiss. The

second floor consists of four maximum security cell blocks and six dormitory cells.

On April 20, 1977, an inmate at the county jail filed a *pro se* civil rights complaint against the Freeholders, the Sheriff and his Chief Deputy. At that time, the Sheriff was the custodian of the jail pursuant to N.J.S.A. 30:8–17, 18. Affidavit of Stephen R. Knox at ¶ 12. The complaint alleged that, on November 13, 1976, fourteen prisoners were housed in cell 208 which contained only nine beds. It further alleged that available on the second floor was bedspace for only 86 inmates, but 105 inmates were housed there. Complaint in *Vespa v. Board of Freeholders of Burlington County*, Civ. No. 77–0765 (D.N.J. April 20, 1977) attached as Exhibit U to Vol. II Exhibits in Support of Knox Affidavit. On March 28, 1978, three other inmates represented by Camden Regional Legal Services, Inc., filed a similar civil rights action. Complaint in *Morrison v. Brenna,* Civ. No. 78–628 (D.N.J. March 28, 1978). These two cases (hereinafter referred to as *"Vespa "*) were consolidated before the Honorable Dickinson R. Debevoise. At that time, defendant Hogan was an Assistant County Solicitor and was assigned to oversee the county's defense of these cases.

During the course of the *Vespa* litigation, the Freeholders retained the services of one William Nagle, a corrections expert, to assist in their evaluation of the county jail.[2] Based on Nagle's recommendations, the recommendation of defendant Hogan, and their own knowledge of jail conditions,[3] the Freeholders on January 28, 1987 authorized Hogan to execute a consent judgment on their behalves. Knox Aff. ¶¶ 17, 18. On January 29, 1981, Hogan and plaintiffs' counsel executed that judgment. *Id.* ¶ 18. The Sheriff and his deputy refused to sign. *Id.* ¶ 19. Plaintiffs filed a motion seeking leave of the court to approve the settlement. On April 27, 1981, the Sheriff and

---

**2.** Nagle will testify as an expert witness for plaintiff in this action.

**3.** The Freeholders' opinion was undoubtedly affected by reports from the Department of Corrections recommending "extensive renovation and/or new construction." October 14, 1980 Letter from Louis J. Scaua to Acting Warden

Burlington County Jail attached as Exhibit J to Plaintiff's Appendix in Opposition to Fauver and Call's Motion to Dismiss. *See also* February 6, 1981 Letter from Levin J. Scavo to Acting Warden Burlington County Jail attached as Exhibit P–17 to Plaintiff's Appendix in Opposition to Fauver and Call's Motion to Dismiss.

his deputy informed Magistrate John Devine that they would not sign. Magistrate Devine ordered the Freeholders to take control of the jail and then approved the settlement. *Id.*

On May 13, 1981, the Freeholders adopted a resolution assuming jurisdiction, custody, and control of the county jail. Exhibit K to Vol. II of Exhibits to Knox's Aff. This resolution was enacted on the Board's initiative and had been contemplated prior to Magistrate Devine's order. Knox Aff. ¶ 20. On June 1, 1981, Judge Debevoise vacated Magistrate Devine's order but, noting the Freeholder's resolution, nevertheless approved the settlement. *Id.* ¶ 21.

The consent decree approved by Judge Debevoise contained "provisions which the parties agree are necessary to the ends of justice." It did not contain an admission of liability nor an admission of a violation of plaintiffs' constitutional rights. The consent order, however, capped the total number of inmates "except in emergencies" at 117. A maximum of 8 inmates were to be housed in cell 208. Settlement Agreement at 4–5 Attached as Exhibit P–3 to Plaintiff's Appendix in Opposition to Hogan's Motion for Summary Judgment.

Additionally, the consent decree provided that, by June 22, 1983, defendants would renovate the county jail to include "an inmate reception area with a [sic] least eight (8) individual detention rooms for classification." *Id.* at 4. Within ninety days of the settlement order, defendants agreed that "all inmates shall be reviewed within sixty (60) days of admission to determine their appropriate living area ..." *Id.* at 17.

In late 1981, the County Jail Warden, the County Prosecutor, defendant Hogan, the Honorable Martin J. Haine, A.J.S.C., and others formed a committee to discuss possible ways to resolve overcrowding at the county jail. Knox Aff. ¶ 27. Plaintiff does not dispute Knox's representation that this committee was strictly advisory and that it was not empowered to effect policy or administer procedure. *Id.* ¶ 28.

From Burlington County's perspective, it was unfortunate that Executive Order No. 106 was issued the day after the *Vespa* consent decree was signed by the Court. Obviously, the new practice of directing state inmates to be housed at county facilities was at cross-purposes with the *Vespa* consent decree cap of 117 prisoners. On November 24, 1981, defendant Hogan advised defendant Fauver that the county jail was averaging 20 to 22 state holdovers per day. Hogan explained the steps taken by the overcrowding committee to alleviate the problem. He concluded:

> ... As you can see, Burlington County is earnestly trying to comply with the Federal Order. *I would like to request that the Department of Corrections assist in this task by expediting the removal of state prisoners from our facility.* Since the state prison population has risen so drastically in the last month, the *potential of a major disaster in the prison has also increased. The Burlington County Jail is not a maximum security facility and does not have the proper physical plant to maintain this large number of state inmates.*
>
> We are aware of the Governor's executive order and the statewide overcrowding emergency. *The Freeholders believe that the Federal Order cannot be ignored however and that the Department of Corrections should do everything possible in conjunction with the efforts of the County to lower this population.* By the state expediting the removal of state inmates, there will be considerable relief of our high prison population, particularly when done in concert with the efforts of Judge Haines and the Board of Freeholders. *It is obvious that the natural result of these efforts will be to alleviate what is fast becoming a dangerous overcrowding situation.*

Attached as P–15 to Plaintiff's Appendix Opposing Hogan's Motion for Summary Judgment (emphasis added).

On December 2, 1981, defendant Fauver responded as follows, copying defendant Call:

> As you already may be aware, the backup of State-sentenced inmates throughout the county facilities recently reached

an all time high of 900, with some counties coping with backups in excess of 80 and 90 State inmates. Concurrently, our State facilities are over capacity, parole rates are declining, and even fewer beds are becoming available as time goes by. While I recognize that Burlington County is not responsible for our problems, and while I fully appreciate the import of the Federal Court Order, I mentioned the foregoing simply to illustrate the magnitude of the problem and the degree to which we must struggle to achieve even a small measure of fairness with respect to assisting all counties.

*Although it is not possible for us to completely eliminate our backup in Burlington, please be assured that we are cognizant of the pressures under which you are operating and that we will continue to try to assist you on at least a piecemeal basis.* You are to be congratulated for the various solutions your committee is considering, and I deeply regret that circumstances prevent us from doing more to relieve the problem.

Attached to P–59 of Plaintiff's Appendix Opposing Hogan's Motion for Summary Judgment (emphasis added).

On February 26, 1982, state representatives inspected the county jail and issued a report on March 30, 1982. This report indicated that the average daily population between July 28, 1981 and February 28, 1982 was 156.95, well above the cap of 117. Regarding classification, the Report stated:

The written plan for classifying inmates is presently under revision. It is recommended to continue the efforts to complete the revision of the written classification plan.

There is no classification manual available at this facility. It is recommended that a classification manual be developed in accordance with the Manual of Standards for New Jersey Adult County Correctional Facilities.

All females are housed in the minimum security facility in New Lisbon.

The limited facilities preclude the possibility of an effective classification system with regard to housing assignments.

February 26, 1982 Report at 5 attached as Exhibit K to Plaintiff's Appendix Opposing Fauver and Call's Motion to Dismiss. The Report recommended that the county jail continue efforts to complete revision of the written classification plan and develop a classification manual in accordance with the Manual of Standards referred to above. *Id.* at 12.

On August 12, 1982, the Department of Corrections wrote the Warden of the County Jail noting progress on the recommendations made in February. As to the recommendations regarding classification, it was noted that plans to implement these recommendations were in draft form. August 12, 1982 Letter Attached as P–16 to Plaintiff's Appendix Opposing Fauver and Call's Motion to Dismiss.

On November 23, 1982, Hogan wrote to Fauver requesting waivers of certain standards regarding the renovation of the County Jail pursuant to the *Vespa* consent order. In describing the *Vespa* consent decree, Hogan explained:

[I]t was the intent of that litigation to substantially improve the physical plant to *constitutional* standards, taking into consideration the existing physical constraints at the County Jail.

\* \* \* \* \* \*

The Order confirms that the issue of square footage was addressed and because of the limited use of those smaller cells as it relates to the larger day space where the inmates spend most of their time, *that a reduction of the population would bring the Burlington County Jail within constitutional standards.*

Exhibit P–11 to Plaintiff's Appendix in Opposition to Fauver and Call's Motion to Dismiss (emphasis added). On December 8, 1982, Fauver wrote Hogan and, after reviewing the county's requests, granted them. Exhibit P–39 to Plaintiff's Appendix in Opposition to Hogan's Motion for Summary Judgment.

The last inspection by state representatives prior to plaintiff's injuries was con-

ducted on February 15, 1983. This report indicates that, for the period July 15, 1982 until February 15, 1983, the average daily population at the county jail was 147.10. The Report indicates that a written classification plan was currently being revised, but that no classification manual was yet available. Exhibit P-8 at 5 attached to Plaintiff's Appendix Opposing Fauver and Call's Motion to Dismiss. It was again recommended that a classification manual be developed in accordance with the Manual of Standards.

Population reports for the period June 23, 1983 through December 31, 1983 indicate that the county jail exceeded 117 inmates on all but 11 days during that period. Had all state inmates been removed during June and July, the county jail would never have exceeded the limit of 117. Late September and October show some of the highest populations for the entire period.

| | | County | State | Total |
|---|---|---|---|---|
| September | 15 | 116 | 22 | 138 |
| | 16 | 120 | 22 | 142 |
| | 17 | 123 | 22 | 145 |
| | 18 | 128 | 22 | 150 |
| | 19 | 131 | 19 | 150 |
| | 20 | 133 | 20 | 153 |
| | 21 | 128 | 20 | 148 |
| | 22 | 130 | 20 | 150 |
| | 23 | 134 | 22 | 156 |
| | 24 | 137 | 22 | 159 |
| | 25 | 143 | 22 | 165 |
| | 26 | 133 | 21 | 154 |
| | 27 | 126 | 22 | 148 |
| | 28 | 123 | 22 | 143 |
| | 29 | 125 | 22 | 147 |
| | 30 | 123 | 22 | 145 |
| October | 1 | 128 | 23 | 151 |
| | 2 | 130 | 23 | 153 |
| | 3 | 117 | 24 | 141 |
| | 4 | 123 | 24 | 147 |
| | 5 | 120 | 23 | 133 |
| | 6 | 120 | 18 | 128 |
| | 7 | 117 | 18 | 135 |

During this period of time, defendant Call was in touch with representatives of each county in New Jersey to determine quotas for the various counties. Deposition of Joseph Call at 165–66. Call testified that he tried to make allowances for special circumstances. *Id.* at 166, 177, 179. While he had no knowledge of any particularly aggravating circumstances in Burlington County, *id.* at 168–169, 184, he had never been inside the Burlington County Jail, *id.* at 161–62, and had no knowledge of what classification procedure was in effect at the county jail. *Id.* at 220. Regarding defendant Fauver's offer to help Burlington County on at least a piecemeal basis, Call stated that he "... would have evaluated this request from the commissioner as to if the opportunity availed itself to try and give Burlington County some relief in terms of their backup." *Id.* at 197. Call admitted that by 1983 he was aware of the consent order and "could assume they probably were over[crowded]. They were all overcrowded and I had to assume Burlington was overcrowded." *Id.* at 175.

Timothy Cooper was the Burlington County official who spoke with Call on a weekly basis. Cooper testified, however, that when he spoke to Call, Call gave him a number of beds, if anything was available:

Sometimes that number of beds would have a stipulation with it, meaning prison sentences only, indeterminants only, depending on the availability of beds in what facility at the state, and in the case of a parole violator, again, depending on where he had been paroled from whether or not there was any availability.

Deposition of Timothy Cooper at 79 attached as Exhibit A to Plaintiff's Appendix in Opposition to Fauver and Call's Motion to Dismiss. From Cooper's perspective, there was very little bargaining with Call:

Q. What would the nature of your conversation have been with Mr. Call?

A. Something along the lines of, you know, I have 40 here, Joe, that's about a third of my population and, you know, I really have to move some, anything. Pretty much pleading I guess.

*Id.* at 87. Cooper also recalled discussing the *Vespa* consent decree with Call.

We discussed on occasion I remember the fact that there were certain counties who had been ordered by the courts that the State had to accept their state prisoners after 15 days, and *this was part of the reason why the number of allocations to Burlington had been cut back to accommodate the five or six counties*

*who they were forced to accept whatever number they had.*

... part of those discussions would have included our Consent Decree which, *of course, the state was not obligated to pay any attention to....*

*Id.* at 89 (emphasis added).

Fauver testified that overcrowding can cause problems in housing, mess halls, visiting areas, and with security. *Id.* at 60. Specifically, "there can be fights among inmates." *Id.* at 62. While stressing that these things can happen even without overcrowding, Fauver admitted that they "were valid concerns." *Id.* at 66. Fauver kept current on the numbers of inmates in the county jails but relied on the inspection reports to ascertain the conditions of these facilities. *Id.* at 31, 32. Fauver normally read the summations in these reports but only after there had been reinspections. *Id.* at 34. Generally, Fauver expected to be informed of "serious violations" if they were not corrected by subsequent inspection. *Id.* at 107.

As to Burlington County, despite his assurance to Hogan in December, 1981 that the Department of Corrections was "cognizant of the pressures under which [the County was operating]," Fauver had little if any knowledge. He did not know that there were no recreational facilities there, did not know inmates slept on mattresses on floors, and did not know that all meals were eaten in the cell in which an inmate lived. *Id.* at 114.

Numerous other persons connected with the county jail provided deposition testimony. The Warden of the county jail in 1983 and a defendant in the instant case, testified that as of October, 1983, none of the terms of the *Vespa* consent decree as to heating, ventilation, electrical system, contact visits, day room space, exercise facility requirements, or classification had been complied with. Deposition of John Bradman at 32 attached as Exhibit C to Plaintiff's Appendix in Opposition to Fauver and Call's Motion to Dismiss. Without tarrying to detail this testimony, it appears undisputed that as of October, 1983, the conditions at the Burlington County Jail were little improved, if at all, over the conditions which existed at the time of the *Vespa* consent decree.

Subsequent to the filing of the *Vespa* action, Hogan was intimately involved in attempting to resolve the problems in the county jail. He was also aware, no later than June 21, 1982, that other counties had sued the state and obtained federal court orders directing the Department of Corrections to remove all state sentenced inmates within fifteen days. *See* Letter of June 21, 1982 to Hogan attached as Exhibit P–112 to Plaintiff's Appendix Opposing Hogan's Motion for Summary Judgment. Eventually, in 1985, at Hogan's suggestion, Burlington County sued Governor Kean and Commissioner Fauver and entered into a similar order, an order that came too late to protect Ryan. *See Consent Order* in *Board of Chosen Freeholders of Burlington County v. Kean*, L–14930–85 (Law Div. March 13, 1985) attached as Exhibit I to Plaintiff's Appendix in Opposition to Fauver and Call's Motion to Dismiss.

### *The Complaint*

As noted earlier, plaintiff brings this action under 42 U.S.C. § 1983, claiming that his fourth, fifth, and fourteenth amendment rights have been violated. Additionally, plaintiff alleges a violation of § 1985(3) and pendent claims sounding in tort.[4]

This case first came before the court in September, 1985 when the Solicitor's Office and defendant Hogan moved for dismissal arguing that Hogan merely effectuated or implemented the Freeholder's decisions and had no control or supervisory power over

---

**4.** While neither party has addressed this issue, I note in passing that it is almost a certainty that plaintiff's pendent claims are barred against any of the named defendants. N.J.S.A. 59:5–2(b)(4) states emphatically that "[n]either a public entity nor a public employee is liable for any injury caused by a prisoner to another prisoner." Whether plaintiff will have his day in court thus depends completely on whether he may maintain his § 1983 claim alleging violations of his constitutional rights.

their actions. On November 14, 1985, I issued an opinion and order explaining:

> At oral argument I was inclined to grant defendants' motion but plaintiff's attorney, Mr. Goldberg, argued that Hogan and the Solicitor's office may be proper defendants regardless of their perception of their duties if it could be shown that such a duty existed by virtue of the consent decree itself and that Hogan and the Solicitor's office knew that there was an ongoing wrong.... I reserved on the motion to consider the issues involved more closely.

Opinion at 3. While that motion was under advisement, plaintiff conducted discovery which clearly created an issue as to whether Hogan was a mere functionary. I, therefore, denied the motion without deciding the legal issue raised. Hogan now renews his motion on both similar and new grounds, including the ground of qualified immunity.

On December 16, 1985, I heard argument on Fauver and Call's Motion for Summary Judgment based on eleventh amendment immunity [5] and qualified immunity. On December 23, 1985, I ordered that Fauver and Call be deposed in the hope that resolution of the qualified immunity issue would become clearer than it was at that time.

To defeat the pending motions for summary judgment, which go beyond the issue of qualified immunity, plaintiff must come forward with facts from which a reasonable jury could conclude in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). This issue of qualified immunity is an issue for the court. With specific reference to qualified immunity, the court must determine the objective legal reasonableness of the defendants' actions assessed in light of the legal rules that were clearly established at the time these actions were taken. *Anderson v. Creighton,* — U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

### *Plaintiff's Constitutional Rights*

42 U.S.C. § 1983 provides redress only for infringements of rights "secured by the Constitution and laws of the United States." *Davidson v. O'Lone*, 752 F.2d 817, 821 (3d Cir.1984) (*en banc*), *aff'd sub. nom., Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). A threshold requirement in virtually every § 1983 action is the identification of which constitutional right a plaintiff seeks to vindicate.

Plaintiff's complaint relies on the fourth, fifth, and fourteenth amendments. Additionally, in some of plaintiff's supporting papers, reference is made to the eighth amendment. Plaintiff has not pressed either his fourth or fifth amendment claims. Additionally, it is beyond dispute that the eighth amendment does not apply to pretrial detainees. *Robinson v. City of Mount Vernon*, 654 F.Supp. 170, 172 (S.D. N.Y.1987) *citing Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979); *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 1412 n. 40, 51 L.Ed.2d 711 (1977). Accordingly, if any of plaintiff's constitutional rights were implicated in this case, they must have arisen under the fourteenth amendment which states, in part, "nor shall any state deprive any person of life, liberty, or property, without due process of law."

The rights of pretrial detainees were discussed in detail by the Supreme Court in *Bell v. Wolfish, supra. Bell* held that "under the Due Process Clause, a de-

---

**5.** Plaintiff conceded in December, 1985 that the eleventh amendment bars suit against Fauver and Call in their official capacities. However, "to establish personal liability in a § 1983 action it is enough to show that the official, acting under color of state law, caused the deprivation of state law or caused the deprivation of a federal right." *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985) (cite omitted). The fact that any judgment against these defendants in their individual capacities will be paid by the state does not cloak them with eleventh amendment immunity. *Demery v. Kupperman,* 735 F.2d 1139, 1147–49 (9th Cir.1984), *cert. denied,* 469 U.S. 1127, 105 S.Ct. 810, 83 L.Ed.2d 803 (1985). Thus, while Fauver and Call will be dismissed in their official capacities, they may still be subject to personal liability absent qualified immunity.

tainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.* at 535, 99 S.Ct. at 1872. The determination as to whether a particular practice or restriction constitutes punishment in the constitutional sense depends on whether that practice or restriction is rationally related to a legitimate nonpunitive government purpose and whether that practice or restriction appears excessive in relation to that purpose. *Id.* at 538–39, 99 S.Ct. at 1873–74. And while pretrial detainees may not bring an eighth amendment claim, *Bell* makes clear that "pretrial detainees who have not been convicted of any crime retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." *Id.* at 545, 99 S.Ct. at 1877. Thus, Ryan enjoyed two tiers of rights on October 4, 1983 while detained at the county jail: he was entitled to the rights granted convicted persons as well as the right to be free of any practice or restriction placed on him as punishment.

In *Davidson, supra,* 752 F.2d at 821–22, the Court of Appeals for the Third Circuit held that a prisoner has a liberty interest in personal security under the fourteenth amendment. The State of New Jersey appears to concede that this holding is correct. *See* Report on Prison Overcrowding at 12 quoted *ante* at 11–12.

■ It is equally clear that overcrowding can rise to such a level as to violate a prisoner's or pretrial detainee's constitutional rights. *Union County Jail Inmates v. DiBuono,* 713 F.2d 984, 992 (3d Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984), *citing Bell, supra,* 441 U.S. at 542, 99 S.Ct. at 1875. *See also* Report on Prison Overcrowding, *supra.* Whether overcrowding rises to such a level, however, requires a determination "as to whether these conditions 'cause [inmates] to endure [such] genuine privations and hardship over an extended period of time,' that the adverse conditions become excessive in relation to the purposes assigned for them." *DiBuono, supra,* 713 F.2d at 992.

In *Union County,* the Honorable Harold A. Ackerman adopted the findings of the Hon. Worrall F. Mountain, a former Justice of the Supreme Court of New Jersey serving as special master, that each of six specific conditions emanating from overcrowding, as applied to pretrial detainees constituted punishment. 713 F.2d at 993–94 and n. 11. The Third Circuit tacitly concluded that, under the totality of the circumstances, as to pretrial detainees, overcrowding at the Union County Jail would amount to punishment. *Id.* at 996. However, because the court found that the remedial scheme put forth by the Commissioner would effectively cure all of the conditions that were of particular concern to the Special Master, conditions at the jail would pass constitutional muster when the proposals were implemented.

■ In the present case, there is ample evidence which, if accepted, would lead to the conclusion that, as to Ryan, the conditions at Burlington County Jail constituted punishment and, as in *Union County,* were excessive to the purposes assigned for them. The Warden of the County Jail admitted in his deposition that, as of October, 1983, all of the conditions described by Justice Mountain existed at the Burlington County Jail. Deposition of John Bradman at 32 attached as Exhibit C to Plaintiff's Appendix in Opposition to Fauver and Call's Motion to Dismiss. Viewing the facts in the light most favorable to plaintiff, I conclude that his constitutional rights were violated in this regard.

Plaintiff has also suggested that there is a constitutional right to a classification system by which new inmates are assigned appropriate living accommodations. The Fifth Circuit has held that "*the confinement of pretrial detainees indiscriminately with convicted persons is unconstitutional unless such a practice is 'reasonably related to the institution's interest in maintaining jail security' or physical facilities do not permit their separation.*" *Jones v. Diamond,* 636 F.2d 1364, 1374 (5th Cir.) (*en banc*), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3141, 69 L.Ed.2d 993 (1981) (emphasis added). In *Riley v. Jeffes,* 777 F.2d 143, 145 (3d Cir.1985), the Third Circuit quoted *Jones, supra,* for the proposi-

tion that "when prison officials have failed to control or separate prisoners who endanger the physical safety of other prisoners and the level of violence becomes so high ... it constitutes cruel and unusual punishment."

Some courts have found a constitutional right to a reasonable classification system in a local jail. *See, e.g., Campbell v. McGruder,* 580 F.2d 521, 546–48, 565–70 (D.C.Cir.1978), *aff'g in part,* 416 F.Supp. 100, 105 (D.D.C.1975); *Jones v. Metzger,* 456 F.2d 854 (6th Cir.1972), *aff'g,* 323 F.Supp. 93 (N.D.Ohio 1971); *Jones v. Wittenberg,* 330 F.Supp. 707, 717 (N.D.Ohio 1971); *Barnes v. Government of Virgin Islands,* 415 F.Supp. 1218, 1235 (D.V.I. 1976); *Rhem v. Malcolm,* 371 F.Supp. 594, 617–20 (S.D.N.Y.), *aff'd and remanded,* 507 F.2d 333, 339–40 (2d Cir.1974), on *remand* 389 F.Supp. 964, 968 (S.D.N.Y.1975), *amended,* 396 F.Supp. 1195, 1201–02 (S.D. N.Y.1975), *aff'd,* 527 F.2d 1041 (2d Cir. 1975). In *Bell v. Wolfish,* the trial court granted pretrial detainees relief on their classification claim finding that pretrial detainees were entitled to be "protected from physical and mental injury." 439 F.Supp. 114, 125–28 (S.D.N.Y.1977). That ruling was not appealed at least to the Supreme Court and to date this issue has never been squarely addressed by that court. *See Bell v. Wolfish, supra,* 441 U.S. at 529 n. 10, 99 S.Ct. at 1868 n. 10.

Congress did not believe that pretrial detainees have an *absolute* constitutional right to housing separate from convicted inmates for, in the Bail Reform Act of 1984, it stated that when denying bail, a detention order

> shall direct that the person be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held custody pending appeals.

18 U.S.C. § 3142(i)(2). While it is, of course, ultimately for the courts to decide

if such a right exists, I find it relevant to consider Congress' opinion.

■ I conclude that pretrial detainees have a constitutional right to be housed separately from known dangerous convicted inmates who pose a threat to their personal security unless physical facilities do not permit their separation.[6] Applying this standard to the instant case, I conclude that plaintiff has alleged a constitutional right which may or may not have been violated.

■ There is a factual dispute in the record as to whether the physical facilities in 1983 allowed for classification. The State Inspection Reports of Burlington County Jail consistently stated that "The limited facilities at the main jail preclude the possibility of an effective classification system with regard to housing assignments." Additionally, there was some deposition testimony supporting that conclusion. Deposition of Captain Edgar H. Pierce at 44–45 attached as Exhibit B to Plaintiff's Appendix Opposing Fauver and Call's Motion to Dismiss.

There is, however, evidence from which a jury could conclude that classification was possible in 1983. First the fact that the *Vespa* consent decree called for classification at the county jail within sixty days suggests that in 1981 classification was considered possible. Second, the record is clear that, even on days in 1983 when overcrowding was minimal or non-existent, there was no attempt to classify inmates. This supports an inference that the lack of classification was a result of reasons other than overcrowding. Finally, there is presently a classification system used in Burlington County and plaintiff's expert John Case testified that a similar system could have been used in 1983. September 8, 1986 Expert Report at 5. Accordingly, if plaintiff can prove at trial that classification was feasible at the Burlington County Jail in 1983, he will have proved a constitutional violation.

---

**6.** I have not ignored the first part of the Fifth Circuit's test in *Jones* — "reasonably related to the institution's interest in maintaining jail security" — obviously derived from *Bell.* However,

confining a pretrial detainee with a known dangerous convicted inmate could never be *per se* reasonably related to maintaining jail security.

## Qualified Immunity

Defendants Fauver, Call and Hogan argue that, as a matter of law, they are protected by qualified immunity and that the court should find in their favor on this issue now. In *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." In *Skevofilax v. Quigley*, 586 F.Supp. 532 (D.N.J.1984), I had occasion to explain that under *Harlow*, the question of qualified immunity is "ordinarily wholly one of law, to be decided by the court before the commencement of trial." 586 F.Supp. at 535. I also explained that the issue in such a determination "is almost invariably one of determining whether, as an objective matter, the defendant reasonably should have known the law under which his conduct is being assessed .... [t]he inquiry reduces to a determination as to whether the law with respect to the conduct in question is settled or unsettled...." 586 F.Supp. at 538–39.

Recently, *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), restated the *Harlow* standard at 3038, as follows: "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken...." The majority of the court, speaking through Justice Scalia, reiterated what it had recently stated in *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986): that application of this standard would accord the protection of qualified immunity to "all but the plainly incompetent or those who knowingly violate the law" and described *Harlow* as a "guarantee of immunity." *Anderson v. Creighton*, 107 S.Ct. at 3038–39.

Justice Scalia explained that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 3039. Here, the "contours" of the rights plaintiff enjoyed were "sufficiently clear" to be deemed "clearly established" within the meaning of *Harlow*. Indeed, plaintiff's constitutional rights to physical security and protection from overcrowding were explicitly recognized by the State of New Jersey in 1981 in the Report on Prison Overcrowding prepared in part by Fauver. Certainly, *Bell v. Wolfish* was decided long before 1983 and addressed these very issues. While plaintiff's right to classification was not characterized in the 1981 Report as "constitutional right," the County Manual emphasized the importance of classification as did the *Vespa* consent decree. And, in *Harlow* terms, while there were no pre–1983 Third Circuit cases explicitly recognizing classification to be a constitutional right, there was a large body of caselaw elsewhere which did so. *See ante* at 477–78.

But finding that the legal rules in effect when defendants' actions were taken were "clearly established" does not, of course, end the inquiry. The determination must also be made as to whether, as an objective matter, a reasonable public official would understand at the time he acted that what he was doing violated those clearly established rules. Even if a public official mistakenly concludes that what he or she is doing is lawful, as long as the official reasonably believes that his or her conduct was lawful, the official should not be held personally liable. *Id.* at 3039. Stated somewhat differently, "the relevant question ... is the objective (albeit fact-specific) question whether a reasonable officer would have believed [the defendants' conduct] to be lawful, in light of clearly established law and the information the [defendants] possessed. The defendants' subjective beliefs [about that conduct] are irrelevant." *Id.* at 3040.

Parenthetically, it was heartening to be reminded in *Anderson* that the Court has been unwilling to complicate what it believes to be the uncomplicated qualified im-

munity analysis by making the scope or extent of immunity turn on the precise nature of various officials' duties. *Id.* Yet the thrust of defendant Hogan's argument to me is that he had no power over and, thus, presumably no duty to the Burlington County Jail and as a result, could not correct unconstitutional conditions therein. Defendants Fauver and Call argue that they were not charged with the day to day administration of the Burlington County Jail.

Were I required on this motion to reach this issue, I would be compelled to say that as to defendant Hogan the resolution thereof is fact dependent with the facts disputed and resolution of these facts intertwined with questions of credibility. The fact that there is no written by-law or resolution granting Hogan power over the jail or charging him with a duty to the jail is not dispositive for, as Hogan himself noted, in county positions such as his there is no bright line dividing those who decide and those who follow through on these decisions. The reality is that by-laws and resolutions aside, it is force of personality and personal charisma which determine how much unfettered power a particular county Solicitor enjoys. Stated somewhat differently, were the issue before me to turn on whether Hogan was a Player with a capital "P" or a mere functionary, I would have to conclude that that would be a factual question for the jury with the court, upon the jury's answers to interrogatories, reserving its right to then rule on the issue of qualified immunity.

Turning to Fauver and Call, it is quite true that they were not explicitly charged with the day to day administration of the Burlington County Jail. But it is absolutely clear that the overriding purpose of Executive Order No. 106 was to create a central authority for all penal institutions in the state. On its face, Executive Order No. 106 referred to the overcrowding problems of both the state and the county facilities and found that "there is a need to efficiently allocate inmates of state and county penal and correctional institutions to those institutions having available space in order to alleviate overcrowding...." To effectuate this goal, Executive Order No. 106 granted Fauver the authority and power to transfer prisoners from county to county, county to state, and state to county. Call, of course, had the authority to set the number of beds. And, most importantly, Fauver was explicitly given authority "to designate the place of any inmate ... when deemed appropriate by the Commissioner regardless of whether such inmate has been sentenced or is *being held in pretrial detention....*" (emphasis added).

Centralization of power was the cornerstone of the Supreme Court of New Jersey's refusal to strike down Executive Order No. 106. *Worthington, supra,* 88 N.J. at 196, 201, 440 A.2d 1128. And, as noted before, it was the reason why the Supreme Court rejected Judge Joelson's biting criticism that the order was just another way "for state officials to dump their problems on county officials who already have the same or worse problems." *Worthington, supra,* 180 N.J.Super. at 389, 434 A.2d 1134 (Joelson, J., dissenting).

Despite the clear language of Executive Order No. 106 and its interpretation by the Supreme Court of New Jersey, the record indicates that Fauver and Call acted primarily to protect state interests. Perhaps the most significant statistic in the Report on Overcrowding is that the state facilities in November, 1983 were operating at 102% of capacity while the county facilities, including the 960 state inmates housed there, were operating at 121% of capacity. Had those 960 state inmates been removed from county to state facilities the figures would have been almost exactly the opposite with, one would imagine, litigation such as is now before me emanating from state, rather than county, facilities.

I do not suggest that the problem of overflow and overcrowding was easily susceptible or even susceptible of resolution given the limited space in state and county facilities. But when the state official given the authority to make the decision to place the overflow of state inmates in county facilities and the state official who decided how many extra inmates would be put in

each jail argue they had no responsibility for those county facilities on a day to day basis, it can only be concluded, albeit sadly, that Judge Joelson was correct all along. It is clear to this court that while prior to Executive Order No. 106 Fauver's authority was merely supervisory, after Executive Order No. 106 Fauver's authority extended as far as necessary to implement the goals set forth therein. Having decided to use county facilities to house state inmates, Fauver assumed responsibility for those county facilities. Similar reasoning applies to defendant Call.

Be that as it may, lack of power and lack of duty are clearly defenses to liability. But, equally as clearly, "[t]he entitlement is an *immunity from suit* rather than a mere defense to liability, and ... is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985) (emphasis in original).

We return to where we began—the *Anderson* test: should reasonable officials, acting in the capacities of these defendants, have understood that their actions violated what I have found to be clearly established rules? More specifically, could defendants have believed their actions to be lawful in light of those rules and the information they possessed.

Without belaboring what has already been belabored, the answer as to defendants Fauver and Call is clearly "No," and their description of their conduct as an attempt to be "as fair and equitable as possible in the allocation of inmates," Br. at 30, even if true, is "irrelevant," as *Anderson* put it. While the jury may well find that the acts of Fauver and Call were not a proximate cause of plaintiff's injuries, those same acts mandate that Fauver and Call's motion for summary judgment on the ground of qualified immunity be denied.

■ Defendant Hogan's motion will be granted. Hogan understood the constitutional dimensions of the problems at the Burlington County Jail and, whether player or functionary, the record reveals Hogan's continued efforts to alleviate these problems, not to ignore them or place them on the back burner. In his letter to Fauver of November, 1981, he warned that there was a potential for a "major disaster" at the Burlington County Jail. Viewed objectively, Hogan's hands at that point were tied and it was reasonable for him to accept Fauver's offer of at least a piecemeal solution and hope, perhaps, for complete relief without the necessity for filing suit as other counties had done.

### The Daniels & Davidson Issue

■ Defendant Hogan argues that the complaint should be dismissed because the evidence as to him shows nothing more than negligent misconduct and, thus, as a matter of law, he cannot be held liable. Given my disposition on qualified immunity as to defendant Hogan, I need not reach this issue but note that the determination he would have me make is more properly made by the jury. Defendants Fauver and Call argue for dismissal because the allegations that they were deliberately indifferent and grossly negligent fail to state a claim under § 1983. This argument is unavailing.

In *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) and *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), the Supreme Court held that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." 106 S.Ct. at 663. However, neither *Daniels* nor *Davidson* decided the issue of whether "recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause." *Daniels,* 106 S.Ct. at 667 n. 3. *See also* 106 S.Ct. 668, 672–75 (Blackmun, J., concurring in *Daniels* and dissenting in *Davidson* ).

Absent Supreme Court precedent, this court is bound by the decision of the Third Circuit. In *Davidson,* Judge Sloviter, writing for the majority of the Third Circuit sitting *en banc,* held that "actions may be brought in federal court under § 1983 when there has been infringement of a liberty interest by intentional conduct,

*gross negligence or reckless indifference, or an established state procedure."* 752 F.2d at 828 (emphasis added). While Judges Weis and Garth did not join in the reference to gross negligence, 752 F.2d at 828 n. 8, it is fair to assume that the three dissenting judges who found mere negligence to be enough to state a claim under § 1983 would agree with that aspect of the holding. *See Hicks v. Feeney,* 770 F.2d 375, 378 (3d Cir.1985). Certainly, district courts within this circuit have assumed that gross negligence is sufficient to state a claim under § 1983. *See, e.g., Heine v. Connelly,* 644 F.Supp. 1508, 1513 n. 5 (D.Del.1986) (Longobardi, J.); *Kempski v. Ellingsworth,* 633 F.Supp. 685 (D.Del.1986) (Roth, J.).

 Plaintiff alleges that defendants were deliberately indifferent to and grossly negligent concerning the above listed constitutional violations. Complaint, ¶¶ 63–71. There is evidence in this record which would enable a jury to find that the conduct of Fauver and Call constituted deliberate indifference and/or gross negligence. Moreover, plaintiff's incarceration in an overcrowded cell with a state prisoner may be characterized under Executive Order No. 106 as a formalized state procedure. I, therefore, conclude that plaintiff's cause of action is not barred by *Daniels* and *Davidson.*

### The Question of Causation

Defendants Fauver and Call, relying on *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), move to dismiss on the ground that it was not foreseeable to them that Ryan would be injured by Scott while in custody. Defendant Hogan argues that under the doctrine enunciated in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), he should be dismissed because plaintiff can establish no affirmative link between his injuries and Hogan's conduct. I deal with these arguments together because they both revolve around the question of proximate cause: what did these defendants do which caused plaintiff's injuries. I note in passing that plaintiff has the right to appeal the quali-

fied immunity decision as to defendant Hogan and in the event my decision is reversed, this issue would then have to be addressed. I address it now.

The Third Circuit recently summarized the *Rizzo* holding as follows:

> In *Rizzo v. Goode,* 423 U.S. 362 [96 S.Ct. 598, 46 L.Ed.2d 561] (1976), the Supreme Court addressed and rejected the argument that a supervising public official has an affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates. It held that even where a pattern of constitutional violations by subordinates is shown, supervising officials do not violate the constitutional rights of the victims of such misconduct unless they have played an "affirmative part" in that misconduct.

*Chinchello v. Fenton,* 805 F.2d 126, 133 (3d Cir.1986). As explained by another district judge within this circuit, "[i]n order to establish an 'affirmative link' the Third Circuit has required an examination of the extent to which the individual 'participated in a pattern of violation by virtue of knowledge, acquiescence, support, and encouragement.'" *Gann v. Schramm,* 606 F.Supp. 1442, 1451 (D.Del.1985) *quoting Black v. Stephens,* 662 F.2d 181, 189 (3d Cir.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982).

To understand how the *Rizzo* standard has been applied in this circuit, it is instructive to compare the facts of *Chinchello* and *Black.* In *Black,* the plaintiff alleged he was involved in a dispute provoked by an Allentown off-duty detective, Stephens. As a result of this incident, plaintiff alleged that Stephens, relying on a police regulation enacted by the Chief of Police which precluded investigations into complaints of police misconduct until after adjudication of any charges against the complainant brought in connection with the alleged misconduct, filed charges against plaintiff in an effort to delay an investigation into Stephens' conduct.

Plaintiff alleged, and the jury found, that the Chief of Police was liable under *Rizzo* because his promulgation of this policy

proximately caused Stephens to file unwarranted charges against plaintiff. On appeal, a panel of the Third Circuit in a divided decision found that the Chief of Police's promulgation satisfied the affirmative link standard of *Rizzo.* 662 F.2d at 189–90. Specifically, the court found it significant that, viewing the facts most favorably to plaintiff, the jury could have concluded that Stephens filed additional charges after being informed that plaintiff had complained to the Chief of Police. These additional charges, the Third Circuit held, could have been viewed as a means of delaying further any hearing. 662 F.2d at 190 n. 8. Judge Garth, in dissent, noted that this evidence was, indeed, weak and criticized the majority for finding on that record that the Chief of Police had participated in a pattern of violation by virtue of support and encouragement. 662 F.2d at 197 (Garth, J. dissenting).

The facts of *Chinchello,* relied on extensively by Hogan, are much different. Plaintiff, a federal inmate, alleged that his outgoing mail had been opened and that he had been placed in administrative detention in violation of his constitutional rights. One of the defendants, Carlson, was the Director of the Bureau of Prisons against whom plaintiff claimed as follows:

> [A] failure to train, supervise or discipline subordinates may be sufficient ground to hold supervisory personnel liable where the supervisor knew or should have known of existing harmful conditions, practices, or lack of procedures that exist within the system he supervises which are substantially likely to violate plaintiff's rights, that such knowledge or lack of knowledge may constitute an implicit acquiescence in, or approval of, employee conduct that ultimately violated plaintiff's rights.

805 F.2d at 132. The Third Circuit emphasized that plaintiff "pointed to no behavior which could have given [any other defendant] the impression that Carlson had approved the kind of conduct of which [plaintiff] complains." *Id.* In holding that the claims against Carlson should be dismissed the *Chinchello* court emphasized that *Rizzo* requires more than inaction or insensi-

tivity and reaffirmed that public officials have "no affirmative constitutional duty to train, supervise or discipline so as to prevent [constitutional torts]." *Id.* at 133.

The case at bar is more closely analogous to *Black* than to *Chinchello.* Plaintiff is not complaining that Fauver and Call failed to train county officials or failed to act in some other amorphous way. Rather, plaintiff claims that Fauver and Call made an affirmative decision as to how Executive Order No. 106 should be implemented. Fauver, as Commissioner of the Department of Corrections, directed that state prisoners be held over in county jails, thus purposefully deciding to shift the burden of overcrowding from state to county facilities. When made aware of the potentially dangerous conditions at Burlington County Jail, Fauver acted to relieve this problem on "a piecemeal basis" as opposed to the more comprehensive resolution he utilized in Essex and Camden Counties and eventually in Burlington County after it filed suit. Similarly, Call made affirmative decisions each week as to how many state prisoners would be removed from the Burlington County Jail as opposed to other county facilities. For purposes of this motion, I must assume that Call did so with knowledge of the *Vespa* consent order and of the general conditions in the Burlington County Jail.

Similarly, while Hogan has gone to great lengths to argue that he had no affirmative duty to act and was acting as a mere functionary in the implementation of the Freeholder's decision, there is evidence from which a jury could properly conclude that Hogan's role was that of an active participant in the resolution of the crisis at the Burlington County Jail.

There is deposition testimony, for example, that various Freeholders relied on Hogan to provide them with facts relating to the county jail and together they discussed various options. Deposition of Catherine Costa at 4, 5 attached as Exhibit C to Plaintiff's Appendix in Opposition to Hogan's Motion for Summary Judgment; Deposition of Robert Shinn at 5, 6; Deposi-

tion of Michael Conda attached as Exhibit E to Plaintiff's Appendix in Opposition to Hogan's Motion for Summary Judgment at 114, 48–49. One Freeholder considered it Hogan's responsibility to ensure that the Freeholders complied with the *Vespa* consent decree. Deposition of Henry Metzger at 177–78 attached as Exhibit G Plaintiffs Appendix in Opposition to Hogan's Motion for Summary Judgment.

Perhaps Hogan best described his role when he testified:

Often in a—I don't know whether you've had any experience in representing municipal bodies or not, but often in that relationship you will sit around a table like we are here today and have discussion of any number of topics, and *in that discussion there are comments and a give and take in discussion.*

*Whether you can constitute that as advice* or giving advice or rendering opinions, that's for someone else to decide, but there were from time to time discussions about compliance with the federal court order and our discussions concerning—my discussions with the Freeholders surrounded compliance with that order.

Deposition of Michael Hogan at 33.

On this record there is an abundance of evidence that Hogan did no more than instructed to do by the Freeholders. Yet, if a jury were to conclude, based on this record, that Hogan's role was in fact more than implementing the instructions of his client—i.e. that as County Solicitor he was a *de facto* player in these events—I would uphold that jury determination. Hogan himself appears to recognize that such a conclusion would not necessarily be erroneous. Hogan, as County Solicitor, used his judgment throughout his dealings regarding the jail. For instance, the Freeholders may have told Hogan to write Fauver a letter in December, 1981 but it was Hogan who wrote that letter. And how Hogan phrased the letter and the responses he invoked provide an affirmative link in the events leading to plaintiff's injuries. Similarly, it was Hogan who decided not to press the issue of state holdovers with Fau-

ver despite his knowledge that other counties had, by simply filing suit in federal court, received consent decrees which would have capped the county jail population at 117.

I emphasize that my analysis here is not based on any failure to act or on whether any of these defendants had authority to act. The responsibility for what happened to plaintiff allegedly falls on these defendants not because of what they failed to do but because each of these defendants took affirmative steps which could, in the eyes of a reasonable jury, properly be the basis for a finding of liability. *Cf. Black, supra.*

█ In light of the above discussion, it is obvious to me that Fauver and Call's reliance on *Martinez* is misplaced. In *Martinez*, the Supreme Court held that a parole board who released someone who later caused plaintiff decedent's death "did not 'deprive' appellant's decedent of life within the meaning of the Fourteenth Amendment." 444 U.S. at 285, 100 S.Ct. at 559. Simply stated, this death was "too remote a consequence of the parole officers' action to hold them responsible under the civil rights law." *Id.*

In *Estate of Bailey v. County of York,* 768 F.2d 503 (3d Cir.1985), the Third Circuit held that a complaint against a welfare agency alleging that the agency, with knowledge that a child had been abused, failed to adequately investigate the mother before returning the child to the mother stated a claim. The district court had dismissed the claim based on *Martinez* because the cause of the child's subsequent death was directly attributable to the child's mother and her boyfriend who were not under the control or supervision of the state. 768 F.2d at 509. The Third Circuit reversed, finding the existence of a special duty under the particular facts of that case involving a minor and a welfare agency. The court noted that *Martinez* was being applied primarily to cases in which the defendant public official or entity had no custodial or other special relationship with the injured person. 768 F.2d at 510. Quoting a case from the Seventh Circuit, the court explained that "[i]f the state puts a man in

a position of danger *from private persons* and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." *Id.,* *quoting Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982) (emphasis added by Third Circuit).

In this case, defendants Fauver and Call, by the acts discussed above, helped create the "snake pit" into which plaintiff was put against his will. Indeed, any suggestion that they did not understand the conditions they were fostering is belied by the record. Fauver indicated in his deposition as well as in the Special Report on Overcrowding that conditions such as existed in October, 1983 in Burlington County could lead to fights. Certainly, Hogan had warned Fauver of the potential dangers.

I conclude that this case is factually distinct from *Martinez.* In *Martinez,* the defendants released a parolee into the general population and lost all control over him. In the case at bar, the defendants were part of a system that took plaintiff in and, against his will, placed him in an unsafe environment. While a finding that the conduct of Fauver and Call was a proximate cause of plaintiff's injuries is certainly not a fore-ordained conclusion, neither can that issue be taken away from the jury at this juncture.

\*　　\*　　\*

██ Defendants Fauver and Call also move to dismiss the § 1985(3) claim. I agree that plaintiff has failed to show any class based discrimination which is, of course, the cornerstone of a cause of action under § 1985(3). *Berlanti v. Bodman,* 780 F.2d 296, 298 n. 3 (3d Cir.1985) *citing Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). This claim is dismissed. In light of my earlier remarks, I will also dismiss plaintiff's claims premised on the fourth, fifth and eighth amendments. Finally, I will dismiss, because of the eleventh amendment, plaintiff's complaint against Fauver and Call in their official capacities.

The court will enter an order reflecting this decision.