805 F.2d 126
 CHINCHELLO, Edward, Lewisburg Prison Project, Inc.
Schoppert, Douglas, Esquire
v.
FENTON, Charles, Carlson, Norman, Director, Bureau of
Prisons, Doe, John, Corrections Officer, FCI, El Reno,
Scott, Officer, Corrections Officer, FCI, El Reno, Welsh,
Gene, Correctional Supervisor, FCI, El Reno, Oklahoma,
Martin, Thomas C., Warden, FCI, El Reno, Oklahoma, Wisehart,
David L., Chief Correctional Supervisor, FCI, La Tuna,
Texas, Wingfield, R., Chief Correctional Supervisor, FCI, El
Reno, Oklahoma, United States of America, Martin, Robert,
Martin, Thomas C.
Appeal of Norman CARLSON and Boyde Scott.
 No. 86-5057.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 6, 1986.
Decided Nov. 14, 1986.
 
 Robert C. Hauhart (argued), Lewisburg Prison Project, Inc., Lewisburg, Pa., for appellees.
 James J. West, U.S. Atty., James W. Walker, Asst. U.S. Atty., M.D.Pa., Victor D. Stone (argued), Benjamin C. Flannagan, U.S. Dept. of Justice, Washington, D.C., for appellants.
 Before SEITZ, ADAMS, and STAPLETON, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 Edward Chinchello, an inmate at the Federal Correctional Institution in El Reno, Oklahoma, (FCI El Reno) brought this Bivens action[1] against a number of federal corrections officials alleging that his outgoing, confidential mail had been opened and that he had been placed in "administrative detention" in violation of numerous amendments to the United States Constitution.[2] Two of the defendants, Norman Carlson, Director of the Bureau of Prisons, and Boyde Scott, a corrections officer at FCI El Reno, moved for summary judgment. They filed these appeals following denial of their motions. We will dismiss Scott's appeal for want of jurisdiction. We will reverse the district court's order denying Carlson's motion and will direct that summary judgment be entered in his favor.
 
 I.
 
 2
 Chinchello was transferred from the federal prison in Lewisburg, Pennsylvania, to FCI El Reno on March 18, 1983. On March 26th, Chinchello used "special mail"[3] to send a press release concerning conditions at FCI El Reno to his former attorney at the Lewisburg Prison Project, with directions to forward the press release to Mike Wallace of "60 Minutes." Chinchello alleges that prison officials improperly opened this "privileged" correspondence.
 
 
 3
 On March 27, the day after Chinchello wrote and mailed the letter, he was placed in administrative detention, where he remained until April 7, 1983. He alleges that this detention was imposed without notice and a hearing and in retaliation for his attempt to publicize poor conditions in the prison. The defendants, on the other hand, assert that Chinchello was one of many prisoners properly placed in detention as part of an investigation of a food strike at FCI El Reno which occurred between March 25 and March 28.
 
 
 4
 Chinchello's original complaint alleged that Carlson, acting "through an unnamed officer, employee, agent or servant of the Bureau of Prisons," conspired to interfere with Chinchello's legal correspondence. (52a) The complaint also alleged that Carlson, through named employees, confined Chinchello in administrative detention. With respect to Scott, Chinchello alleged that he participated in the decision to place Chinchello in isolation for dispatching the letter concerning prison conditions and that he acquiesced in Chinchello's remaining there for twelve days despite his knowledge that Chinchello was being detained in violation of his constitutional rights.
 
 
 5
 Carlson and Scott promptly moved to dismiss or, in the alternative, for summary judgment. In support of his motion, Carlson filed an affidavit swearing that he had "no knowledge of nor involvement in decisions directly concerning" Chinchello and that "[a]ny actions [he] might have taken that could have even remotely or indirectly affected [Chinchello] were done within the scope of [his] employment as Director, Bureau of Prisons." (15a) Scott also filed an affidavit averring that any involvement he may have had was limited to the ministerial action of escorting Chinchello to detention. Although noting that the complaint did "not indicate precisely how or the extent to which Carlson was involved in the conspiracy," the court denied both motions to dismiss. (26a) It deferred decisions on the motions for summary judgment until Chinchello's counsel had had an opportunity to conduct discovery.
 
 
 6
 Counsel took several depositions including a deposition of Carlson. In his deposition, Carlson testified that he had never heard of Chinchello prior to the filing of this suit and that he had been unaware of any disturbances occurring at FCI El Reno in March and April of 1983. He further testified at length about his responsibility for directing the affairs of the Bureau of Prisons from Washington, D.C.
 
 
 7
 In responding to the summary judgment motion following discovery, Chinchello filed no affidavit tending to show that Carlson had knowledge of the food strike, the opening of the letter, or Chinchello's detention. Indeed, Chinchello acknowledged Carlson's "admitted lack of knowledge of whether an event termed a 'food strike' ... occurred or did not occur" at FCI El Reno in March or April of 1983. (87a) Chinchello's response to Carlson's denial of any contemporaneous knowledge of the events giving rise to the suit was the following:Defendant Carlson failed to train, supervise, and discipline Defendants Scott and Doe properly and as a direct result of Defendant Carlson's failure to perform this ministerial function [Plaintiff] suffered violations of [his] constitutional rights. Defendant Carlson, through his failure to supervise properly, had direct involvement in the establishment of practices and policies of the Federal Correctional Institution at El Reno, Oklahoma, Bureau of Prisons, United States Department of Justice, pursuant to which subordinates directly charged with the discipline, treatment, and care of inmates therein ... engaged in conduct that violated [Plaintiff's] constitutional and statutory rights.
 
 
 8
 (89a) Chinchello's response to Carlson's motion did not identify any practice or policy formulated by Carlson which authorized the conduct of which he complained. Rather, he complained that Bureau of Prisons regulations designed to prohibit such conduct were not enforced by Carlson in this instance.
 
 
 9
 In response to Scott's motion, Chinchello filed an affidavit averring that Scott was a senior "watch officer" who was in charge of the 275-300 inmate, "Oklahoma" housing unit and that he supervised its affairs from behind a desk in the principal office of the unit. Chinchello further swore that Scott appeared to be in command when Chinchello was summoned immediately prior to his detention and that Scott declined to give him any explanation for his being summoned. According to Chinchello, Scott then had him strip searched and taken to the detention section of the unit by another corrections officer. Based on these facts and Carlson's deposition description of the responsibilities of an officer of Scott's apparent rank, Chinchello argued that Scott must have been a participant in the detention decision or, at the very least, must have known the reason for the detention during the twelve day detention and acquiesced in it.
 
 
 10
 On December 18, 1985, the court denied both motions for summary judgment. While expressing some reservation about the viability of Chinchello's claims against Carlson based on his alleged failure "to train, supervise or discipline those persons in his employ" he nevertheless allowed Chinchello to go forward on that claim. (158a) Despite Chinchello's concession that Carlson had no contemporaneous knowledge of the events at FCI El Reno, the court stated that there was a material dispute of fact as to whether "Carlson knew or should have known of an intended food strike at the Federal Correctional Institution at El Reno, Oklahoma, and that an intercepted piece of mail addressed to an attorney concerning this food strike was the proximate cause of Plaintiff Chinchello's alleged wrongful placement in administrative detention." (158a) These appeals followed.
 
 II.
 
 11
 The threshold issues in these appeals are jurisdictional ones. An order denying a motion for summary judgment is ordinarily not a final order and, accordingly, is not normally appealable. Metex Corp. v. ACS Industries, Inc., 748 F.2d 150, 153 (3d Cir.1984). Under the "collateral order" doctrine, however, a decision of a district court is appealable as a "final decision" under 28 U.S.C. Sec. 1291 if it falls within "that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). In Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court held that this "small class" of reviewable district court decisions includes at least some decisions denying a motion for summary judgment made by a public official who claims to be entitled to qualified immunity. We must first resolve Chinchello's assertions that Mitchell governs neither of the appeals before us.
 
 
 12
 The issue with respect to Scott's appeal is quickly resolved. Chinchello correctly points out that Scott did not make a claim of qualified immunity in support of his motion for summary judgment. Accordingly, Mitchell is inapplicable and the district court's decision on Scott's motion is not one of that "small class" which is reviewable prior to the entry of a final judgment.[4]
 
 
 13
 Resolution of Chinchello's jurisdictional challenge to Carlson's appeal requires more extensive analysis. In Mitchell, after reviewing several cases holding that appeals of orders denying absolute immunity were immediately appealable, see Abney v. United States, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (immunity based on double jeopardy); Nixon v. Fitzgerald, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982) (absolute immunity of the President); Helstoski v. Meanor, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979) (denial of motion to dismiss based on immunity under the Speech or Debate clause would be immediately appealable), the Supreme Court held that qualified immunity was "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." 105 S.Ct. at 2816. In reaching this conclusion, the Court relied upon the policy considerations behind the qualified immunity doctrine. Those considerations were articulated in Harlow v. Fitzgerald: "[W]here an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' " 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (quoting Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967)). The "consequences" referred to include "the general costs of subjecting officials to the risks of trial--distracting of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." Harlow, 457 U.S. at 816, 102 S.Ct. at 2737. Where possible, qualified immunity should even protect officials from pretrial matters such as discovery, for "[i]nquiries of this kind can be peculiarly disruptive of effective government." Id. at 817, 102 S.Ct. at 2737.
 
 
 14
 Because qualified immunity is a right not to stand trial, rather than merely a shield against liability, the Mitchell court concluded that it could not be vindicated by appellate review after final judgment and that a denial of a motion for summary judgment on grounds of qualified immunity was a conclusive determination. Also finding that entitlement to qualified immunity was an issue conceptually distinct from the merits of the case, the Court concluded that such a denial was a "final decision" under the collateral order doctrine.
 
 
 15
 Chinchello contends that Mitchell does not render "final" for purposes of Section 1291 every district court decision denying a public official's motion for summary judgment. Specifically, he asserts that Mitchell confers jurisdiction on a court of appeals only to review issues of law relating to whether the defendant's alleged (by the plaintiff) or acknowledged (by the defendant) conduct violated clearly established legal norms. Chinchello argues that Mitchell is inapplicable here because Carlson seeks to attack an allegedly erroneous finding of a material dispute of fact regarding Carlson's conduct and state of mind rather than an erroneous legal ruling that Carlson's alleged conduct violated well established legal norms.
 
 
 16
 In support of this argument, Chinchello points to the Mitchell court's explanation of why a claim of immunity "is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated," 105 S.Ct. at 2816:
 
 
 17
 An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took.[9]
 
 
 18
 9. We emphasize at this point that the appealable issue is a purely legal one: whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law. 105 S.Ct. at 2816-17.
 
 
 19
 We need not take issue with Chinchello's reading of Mitchell in order to resolve the issue before us. It well may be that an appellate court lacks jurisdiction to review a denial of a motion for summary judgment when a public official, although he has invoked the doctrine of qualified immunity, has attempted to show only that he did not engage in the conduct of which plaintiff complains. As we read the record, however, this is not such a case.
 
 
 20
 At the time of the submission of Carlson's motion, Chinchello no longer contended that Carlson had participated in the alleged wrongful acts at FCI El Reno or that he knew about them at the time and acquiesced in them.[5] Given the record that had been developed, Chinchello had no choice but to concede in the district court, as he has before us, that Carlson had no contemporaneous knowledge. Rather, plaintiff's only viable claim, and the only claim advanced in the briefing of this appeal, is that Carlson violated clearly established legal norms by failing to adequately train, supervise, and discipline the personnel at FCI El Reno when he should have known that such failure would be likely to result in violations of Chinchello's rights. Carlson's summary judgment motion with respect to this claim was based upon the legal proposition that the alleged failure to adequately train, supervise, and discipline, even if true, did not constitute a breach of clearly established legal norms.
 
 
 21
 We acknowledge that on these facts the distinction between an "I didn't do it" defense and a qualified immunity defense based on the absence of a clearly established legal duty is not as clear cut as in most other contexts. One can plausibly characterize Carlson's defense as an assertion that he did nothing which contributed to plaintiff's alleged injury. On the other hand, it can accurately be described as a contention that he violated no clearly established legal norm and we believe that treating it in this manner will best serve the objectives of Mitchell. Carlson, having established that he acted solely in his official capacity, was entitled to point to Chinchello's allegations against him and insist that he should not be subjected to the burden of a trial when he owed Chinchello no clearly established duty to take affirmative steps to see that his constitutional rights were not violated by others. Having unsuccessfully taken that position in the district court, we hold that Carlson is entitled to seek vindication of his right to qualified immunity from us before trial.
 
 
 22
 We also acknowledge that where, as is arguably the case here, the defendant's alleged conduct did not breach a rule of liability, much less a clearly established rule of liability, the qualified immunity issue, in one sense, overlaps with the legal issue on the merits. However, we believe those issues remain sufficiently "conceptually distinct" to permit review. 105 S.Ct. at 2816. In addition to the fact that these two issues may require analysis of the law at different points in time, the immunity issue in this context remains one regarding "clearly established legal norms" even though the resolution of that issue may necessarily follow from the absence of an enforceable legal duty.
 
 
 23
 In short, there are no disputes of fact material to Carlson's qualified immunity claim and the sole issue presented in his appeal is the purely legal one of whether Carlson's alleged failure to train, supervise, and discipline his subordinates so as to prevent Chinchello's alleged injuries violated a legal norm which was clearly established at the time of the alleged defalcations. We hold that we have appellate jurisdiction to resolve that issue.
 
 III.
 
 24
 Chinchello's brief before us summarizes his claim against Carlson as follows:
 
 
 25
 [A] failure to train, supervise or discipline subordinates may be sufficient ground to hold supervisory personnel liable where the supervisor knew or should have known of existing harmful conditions, practices, or lack of procedures that exist within the system he supervises which are substantially likely to violate Plaintiff's rights, that such knowledge or lack of knowledge may constitute an implicit acquiescence in, or approval of, employee conduct that ultimately violated Plaintiff's rights.
 
 
 26
 Appellees' Brief at 22-23. To put this description of Chinchello's claim in context two observations are necessary at the outset. First, Chinchello has not alleged a pattern of conduct by prison officials at FCI El Reno or elsewhere similar to the conduct of which he accuses Scott and his fellow corrections officers. Second, Chinchello has pointed to no behavior on the part of Carlson which could have given Scott or anyone else at FCI El Reno the impression that Carlson had approved the kind of conduct of which Chinchello complains.
 
 
 27
 Chinchello's principal contention is that the Constitution imposed on Carlson an affirmative duty to train, supervise and discipline his subordinates so as to protect Chinchello's constitutional rights from invasion. In addition to this Bivens claim, however, he asserts that 18 U.S.C. Sec. 4042,[6] Federal Prison Program Statement No. 3420.5,[7] and Federal Personnel Manual, Chap. 735, Subchapter 2 (revised July 1969),[8] "spell out positive duties that correctional officials owe to inmates" which were violated by Carlson's failure to train, supervise and discipline. Appellees' Brief at 23. We turn first to Chinchello's Bivens claim.
 
 
 28
 In Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court addressed and rejected the argument that a supervising public official has an affirmative constitutional duty to supervise and discipline so as to prevent violations of constitutional rights by his or her subordinates. It held that even where a pattern of constitutional violations by subordinates is shown, supervising officials do not violate the constitutional rights of the victims of such misconduct unless they have played an "affirmative part" in that misconduct. Id. at 377, 96 S.Ct. at 607.
 
 
 29
 In Lewis v. Hyland, 554 F.2d 93 (3d Cir.1977), cert. denied, 434 U.S. 931, 98 S.Ct. 419, 54 L.Ed.2d 291, we had our first occasion to apply the teachings of Rizzo. In doing so, we noted that the analysis in Rizzo "was aimed at the failure of the plaintiffs to prove the existence of an unconstitutional policy or plan adopted and enforced by the official defendants." 554 F.2d at 98.
 
 
 30
 In Commonwealth of Pennsylvania v. Porter, 659 F.2d 306 (3d Cir.1981), cert. denied, 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982), this court, sitting in banc, again addressed the issue of whether there is an affirmative constitutional duty to supervise. In the Porter case, the members of a Borough Council had a duty under state law to oversee the affairs of the Borough police department. They received complaints about a series of incidents in which one department officer had violated the constitutional rights of citizens, but they took no disciplinary or other action to discourage repetition of the same conduct in the future. We reversed the district court's judgment against the Council members based on a finding that they had violated the plaintiffs' constitutional rights. We held that to be legally responsible, supervising officials "must have played an affirmative role in the deprivation of the plaintiffs' rights," noting that "the officials' misconduct cannot be merely a failure to act." 659 F.2d at 336. Because "the Council members' official actions constitute[d] no more than inaction and insensitivity," 659 F.2d at 337, we concluded that they had not violated the plaintiffs' rights despite their knowledge of a pattern of misconduct by one of their subordinates.
 
 
 31
 Prior to March of 1983, we applied this principle a third time to claims against public officials who had allegedly failed to train, supervise and discipline their subordinates. Black v. Stephens, 662 F.2d 181 (3d Cir.1981), cert. denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). We held, once again, that while supervising public officials may not in any way authorize, encourage, or approve constitutional torts, they have no affirmative constitutional duty to train, supervise or discipline so as to prevent such conduct.
 
 
 32
 It is true, as Chinchello stresses, that some Courts of Appeal have been more willing than ours to infer supervisory approval of unconstitutional conduct from inaction on the part of the supervisor. See, e.g., Turpin v. Mailet, 619 F.2d 196, 201 (2d Cir.1980), cert. denied, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475. The courts taking this view, however, have found liability only where there are both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents,[9] and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate. See, e.g., Orpiano v. Johnson, 632 F.2d 1096, 1101 (4th Cir.1980), cert. denied, 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1981) (prison supervisors' failure to act in the face of pervasive risk, evidenced by a pattern of past incidents, may amount to deliberate indifference); Sims v. Adams, 537 F.2d 829 (5th Cir.1976) (allegation that supervisory officials failed to take action despite systematic pattern of racial violence by subordinate police officers is sufficient to state a Sec. 1983 claim). As we have already pointed out, Chinchello's allegations satisfy neither of these essential elements of liability.
 
 
 33
 We need not review the law of the other circuits, however. Suffice it to say that this is not a case in which there is a Supreme Court case or a consensus among the circuits endorsing the legal norm the defendant official is alleged to have violated. To the contrary, Rizzo and its pre-March 1983 progeny in this Circuit demonstrate that there is no affirmative duty to train, supervise and discipline subordinates. Accordingly, we hold that, taking as true Chinchello's allegations concerning Carlson's failure to train, supervise, and discipline, Carlson's conduct did not violate a clearly established constitutional duty.
 
 
 34
 Turning to Chinchello's other claims, the Supreme Court in Harlow v. Fitzgerald, 457 U.S. at 818, 102 S.Ct. at 2738, instructed that qualified immunity is unavailable if the defendant's conduct violated "clearly established ... statutory rights" and, based on Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), we conclude that the same can be said with respect to conduct which violates rights clearly established by regulatory law. The Supreme Court explained further in Davis, however, that "officials sued for violations of rights conferred by a statute or regulation, like officials sued for violations of constitutional rights, do not forfeit their immunity by violating some other statute or regulation. Rather these officials become liable for damages only to the extent that there is a clear violation of the statutory rights that give rise to the cause of action for damages." 468 U.S. at 194 n. 12, 104 S.Ct. at 3019 n. 12. We believe a corollary of this proposition is that a statute or regulation which imposes no duty on the official enforceable by the plaintiff cannot be a basis for denying qualified immunity. Thus, Carlson's claim of qualified immunity cannot be defeated by reference to any statute or regulation which does not confer upon Chinchello an express or implied cause of action.
 
 
 35
 Section 4042 of Title 18 declares in general terms the responsibilities of the Bureau of Prisons. We do not believe it can fairly be said that this statute was intended to assign any specific responsibility to the Director of the Bureau personally or to create a private right of action against him in favor of the inmates under his indirect care. Williams v. United States, 405 F.2d 951, 954 (9th Cir.1969). Moreover, the same is true with respect to the Statement and Manual cited by Chinchello. Accordingly, we conclude that none of the three can defeat Carlson's claim to qualified immunity.
 
 IV.
 
 36
 For the foregoing reasons, we will dismiss the appeal of Scott, reverse the order denying Carlson's summary judgment motion and remand this case to the district court with instructions to enter summary judgment for Carlson.
 
 
 37
 SEITZ, Circuit Judge, concurring.
 
 
 38
 Plaintiff Chinchello's claim is that the Constitution imposed on Carlson affirmative duties to train, supervise and discipline his subordinates so that the plaintiff's constitutional rights would not be invaded. Assuming the existence of some such affirmative duties, I believe that, as applied to Carlson, the extent of those constitutional duties was not free from doubt under the case law existing at the critical date. I therefore agree that we have jurisdiction over Carlson's appeal and I concur in the judgment of the court reversing the district court based on the application of the qualified immunity doctrine.
 
 
 39
 I agree that Scott's appeal should be dismissed.
 
 
 
 [1]
 Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)
 
 
 [2]
 Two other plaintiffs joined Chinchello in filing suit but it is not necessary to describe or consider their claims in resolving the disputes currently before us
 
 
 [3]
 Special mail is mail directed to attorneys, designated state and federal officials, and "representatives of the news media." It is not to be opened by prison officials. 28 C.F.R. Secs. 540.2, 540.18 (1986)
 
 
 [4]
 At oral argument, Scott's counsel acknowledged that he had not asserted qualified immunity in the district court. He relied instead on the fact that Scott had pleaded sovereign immunity. While this is true, it does not aid Scott here. The district court properly ruled that sovereign immunity barred Chinchello's claim against Scott in his official capacity but that it was irrelevant to Chinchello's Bivens claim against Scott individually. These rulings were reflected in the court's June 18, 1985 order denying a motion to dismiss. Even assuming this order could somehow confer jurisdiction on this Court to review the December 18, 1985 order denying summary judgment, the court's ruling with respect to the Bivens claim was clearly correct
 
 
 [5]
 Chinchello's brief before us candidly acknowledges at p. 17:
 [T]here has been no showing on the record before the District Court upon which the motion for summary judgment must be examined that Defendant Carlson participated personally in the specific acts taken by correctional officials at FCI El Reno, Oklahoma, including intercepting, opening, reading, and redirecting Plaintiff Chinchello's privileged attorney-client correspondence and the related retaliatory detention, and therefore the District Court did not base its denial of summary judgment on this theory.
 
 
 [6]
 18 U.S.C. Sec. 4042 provides, in part:
 The Bureau of Prisons, under the direction of the Attorney General, shall--
 (1) have charge of the management and regulation of all Federal penal and correctional institutions;
 (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise:
 (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States;
 ................................................................................
 
 
 [7]
 Federal Prison Program Statement No. 3420.5:
 As stated in the above regulations, employees shall: ....
 * * *
 
 
 [6]
 2 Responsiveness:
 ... (b) Because failure to respond to an emergency may jeopardize security to the institution as well as the lives of staff or inmates, it is mandatory that employees respond immediately and effectively to all emergency situations.
 
 
 [8]
 Federal Personnel Manual:
 Each employee has a positive duty to acquaint himself with each statute that relates to his ethical and other conduct as an employee of this agency of the federal government; in its regulations, an agency must direct the intention of its employees by specific reference to each statute relating to ethical and other conduct of employees at that agency and to the following statutory provisions.
 
 
 [9]
 Because Chinchello alleges no prior pattern of similar misconduct, this is not a case in which the alleged facts will support an inference that the defendant official was aware of a specific and substantial risk of impending injury to another in his custody and responded with deliberate indifference to whether that injury would occur. Compare Withers v. Levine, 615 F.2d 158, 161 (4th Cir.1980), cert. denied, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59