Timothy RYAN

v.

BURLINGTON COUNTY, NEW JERSEY et al.

Appeal of William H. FAUVER, Commissioner of Corrections, and Joseph Call, Deputy Director.

No. 87-5847.

United States Court of Appeals, Third Circuit.

Argued June 2, 1988.

Decided Nov. 2, 1988.

---

**1200**

W. Cary Edwards, Atty. Gen., James J. Ciancia, Asst. Atty. Gen., Douglass L. Derry, Deputy Atty. Gen. (argued), Trenton, N.J., for appellants.

Joseph Goldberg (argued), Slimm, Dash & Goldberg, Westmont, N.J., Albert Dragon, A. Dragon Associates, Philadelphia, Pa., for Timothy Ryan.

Before SEITZ, SLOVITER and HUTCHINSON, Circuit Judges.

**OPINION OF THE COURT**

HUTCHINSON, Circuit Judge.

Defendants William H. Fauver and Joseph G. Call appeal a district court order, 674 F.Supp. 464, denying their motion for

summary judgment in a 42 U.S.C.A. § 1983 (West 1981) action brought by Timothy Ryan. Ryan sought compensatory and punitive damages for injuries he sustained while a pretrial detainee in the Burlington County Jail. We have jurisdiction to review the district court's order as it pertains to Fauver and Call's claim of qualified immunity under 28 U.S.C.A. § 1291 (West Supp.1988). *See Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). We hold that Fauver and Call did not establish an entitlement to qualified immunity and, accordingly, will affirm the district court's order.

I.

The Burlington County Jail is a small, two story building in Mount Holly, New Jersey. Its first floor contains dormitory housing and its second contains maximum security cell blocks and six dormitory cells. In 1977 and 1978, inmates at the county jail brought civil rights actions against the county sheriff, his chief deputy and the Burlington Board of Chosen Freeholders, alleging, among other things, that the jail was overcrowded and that there was no effective classification procedure.[1] The cases were consolidated and eventually settled.[2] The Settlement Agreement limited the number of inmates that could be housed in individual and dormitory cells, "except in emergencies," capping the total number of inmates at the county jail at 117. Appendix (App.) at 354a–55a. The Agreement also provided for renovation of the county jail by June 22, 1983, to include an inmate reception area with at least eight individual detention rooms "for classification." *Id.* at 354a.[3]

On September 30, 1983, Timothy Ryan was arrested in Medford Township, New Jersey, and charged with motor vehicle violations. Because he could not make bail, he was sent to the Burlington County Jail, where he was placed in a dormitory cell along with nine other persons.[4] One of these was Maurice Scott, who had violated the conditions of his parole on a state prison sentence and was awaiting transfer to a state facility. During the two-month period in which he was incarcerated at the county jail pending this transfer, Scott had been involved in several violent attacks on other inmates. Burlington County Jail documents show that Scott had been convicted of a violent crime that resulted in the injury or death of another person. *See id.* at 379a.

On October 4, 1983, Scott attacked Ryan. At some point after the attack, prison guards placed Ryan on a stretcher and carried him to the jail's infirmary. There, he was handcuffed and shackled before being taken by ambulance to a hospital. Hospital personnel determined that Ryan's

---

1. *Vespa v. Board of Freeholders of Burlington County,* Civ. No. 77–0765 (D.N.J. April 20, 1977) and *Morrison v. Brennan,* Civ. No. 78–0628 (D.N.J. March 28, 1978).

2. On May 13, 1981, the Board of Chosen Freeholders, by resolution, assumed jurisdiction of the Burlington County Jail from the county sheriff, in part to effectuate the settlement of this litigation. App. at 274a. The Honorable Dickinson R. Debevoise approved the Settlement Agreement on June 1, 1981. *Id.* at 376a–78a.

3. With respect to classification, the settlement agreement further provided:
   38. Effective upon the completion of the [inmate reception area], inmates shall, upon admission, be held separately from the general population for the period required for completion of the procedures outlined in paragraph 39.

39. Effective ninety (90) days from the date of this Order, all inmates shall be reviewed within sixty (60) hours of admission to determine their appropriate living area, degree of observation, medical, social and psychological services, and their eligibility for work assignments. Classification and re-classification decisions shall be made by a team including a correctional officer of the rank of Sergeant or above, a member of the psychological and social services staff, and a member of the medical staff. Each inmate shall be advised in writing of a classification or re-classification decision and of his right to request in writing to the classification team a change of any aspect of his classification. The classification team shall render its determination as to each request for re-classification from any inmate within seventy-two (72) hours.
App. at 367a.

4. The Settlement Agreement limited the number of inmates in this cell to 8. App. at 355a.

neck had been broken, rendering him quadriplegic.

In April, 1985, Ryan brought an action seeking compensatory and punitive damages and attorney's fees under 42 U.S.C.A. §§ 1983, 1985 and 1988 (West 1981) against Burlington County; the Burlington County Board of Chosen Freeholders; the Warden of the Burlington County Jail; county prison guards and officials; the Burlington County Solicitor's office; Michael J. Hogan, part-time Solicitor of Burlington County; William H. Fauver, Commissioner of the New Jersey Department of Corrections; and Joseph G. Call, Deputy Director of the Division of Adult Institutions. Ryan claimed that defendants overcrowded the Burlington County Jail, precluding effective classification of inmates and causing his injury, in violation of his liberty interest in personal security and his right as a pretrial detainee not to be punished prior to an adjudication of guilt.[5]

Defendants Fauver and Call filed a motion to dismiss the complaint or, in the alternative, for summary judgment on the basis of eleventh amendment immunity and qualified immunity. The district court reserved decision on this motion and ordered that Fauver and Call be deposed. After giving their testimony on deposition, Fauver and Call renewed their motion to dismiss or for summary judgment, arguing with respect to the § 1985 claim that Ryan failed to show any class-based discrimination and with respect to the § 1983 claim that (1) they could not foresee that Ryan would be injured by Scott while in custody; (2) they had no knowledge of the conditions under which Ryan was incarcerated and were not responsible for the day-to-day administration of the county jail; (3) they were free from suit in their official capacities under the eleventh amendment; and (4) they violated no clearly established rights of which reasonable persons in their positions would have known.

On November 9, 1987, the district court dismissed the § 1985 claim, the state law claims and the § 1983 claims premised on the fourth, fifth and eighth amendments. It also dismissed the complaint against Fauver and Call in their official capacities. The court denied Fauver and Call's motion on all other grounds. Fauver and Call now appeal the denial of their motion with respect to qualified immunity.

## II.

Ryan contends that we lack appellate jurisdiction under *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), because the issues raised by Fauver and Call on appeal are not separable from and collateral to the merits of this case, and resolution of these issues would require review of the record. Development of a record is required in some cases under *Anderson v. Creighton*, — U.S. —, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). *Anderson* teaches that cases requiring development of a record do not in every instance fall outside the scope of *Mitchell*.

In *Mitchell*, the Supreme Court held that a district court's denial of a claim of qualified immunity is an appealable "final decision" under 28 U.S.C.A. § 1291 to the extent that it turns on an issue of law, notwithstanding the absence of a final judgment. *Mitchell*, 472 U.S. at 530, 105 S.Ct. at 2817. In *Anderson*, the Court explained that the issue of law in a qualified immunity case is the "objective (albeit fact-specific)" question whether a reasonable official could have believed his actions lawful in light of clearly established law and the information he possessed. *Anderson*, 107 S.Ct. at 3040. Resolution of this fact-specific question may require discovery and the development of a record "tailored specifically to the question of [the official's] qualified immunity." *Id.* at 3042 n. 6. *Mitchell* and *Anderson* are not designed to ease the workload of appellate judges; the necessity of reviewing a record to determine the propriety of a district court's deni-

---

5. Ryan also asserted several state law claims, over which the district court exercised pendent jurisdiction.

al of a qualified immunity claim does not divest an appellate court of its jurisdiction.[6]

■ We next address Ryan's assertion that we lack jurisdiction because Fauver and Call raise issues that are not appealable. Ryan correctly states that we cannot review issues that pertain to liability on this appeal because the district court's order is "final" only with respect to the collateral issue of qualified immunity. *See Brown v. United States*, 851 F.2d 615, 619 (3d Cir.1988). The flaw in his argument is his apparent assumption that our power of review is dependent upon the proper framing of issues on appeal. We have jurisdiction to review the district court's order under 28 U.S.C.A. § 1291 to the extent that it is final. The court's order is "final" and immediately reviewable under *Mitchell* if Fauver and Call properly raised a claim of qualified immunity in the district court. *See supra* note 6; *Chinchello v. Fenton*, 805 F.2d 126, 130 (3d Cir.1986); *see also Musso v. Hourigan*, 836 F.2d 736, 741 (2d Cir.1988) (appellate review appropriate when district court denies motion for summary judgment without addressing proffered qualified immunity defense). Because they did so, we have jurisdiction to review the district court's order with respect to the question of qualified immunity.[7]

■ Having resolved these challenges to our jurisdiction, we next examine Ryan's claim that Fauver and Call are improperly attempting to obtain review on appeal of issues beyond the scope of qualified immunity. In support of their challenge to the district court's denial of their qualified immunity claim, Fauver and Call assert that they had no knowledge of the specific conditions alleged to be unlawful or of the dangerous propensities of Scott, that they took no action which violated any clearly established right and that they were entitled to rely on county officials to run the Burlington County Jail in a lawful manner. Ryan characterizes these arguments as a form of "I didn't do it" defense, which we have noted might not be cognizable on appeal from a denial of summary judgment. *See Chinchello*, 805 F.2d at 131.[8]

**6.** For the reasons set forth *infra* at 1206–09, Fauver and Call failed on this record to show that they are entitled to summary judgment as a matter of law on the issue of qualified immunity. We are not faced on this appeal with the question of whether *Mitchell* gives us appellate jurisdiction over an order denying an official's motion to dismiss for qualified immunity when the record poses genuinely disputed factual issues material to the application of the *Anderson* standard.

**7.** We note the tension that exists between the Supreme Court's recent directives on the "merits" of qualified immunity claims and the genesis of its decision in *Mitchell* on the appealability of orders involving qualified immunity claims. *Mitchell* is based on the collateral order rationale set forth in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The issues involved in considering the merits of qualified immunity claims are frequently difficult to separate from the issues involved in the merits of the liability question. The application of *Anderson*'s qualified immunity standard is not likely to reduce that entanglement.

**8.** In *Chinchello*, we stated:
It well may be that an appellate court lacks jurisdiction to review a denial of a motion for summary judgment when a public official, although he has invoked the doctrine of quali-

fied immunity, has attempted to show only that he did not engage in the conduct of which plaintiff complains.
805 F.2d at 131. Since *Chinchello*, we have explained that, although we have jurisdiction to review a denial of summary judgment premised on an "I didn't do it" defense, we will not recognize such a defense if it merely refutes plaintiff's case-in-chief. *See Stoneking v. Bradford Area School Dist.*, 856 F.2d 594, 603–04 (3d Cir.1988); *cf. Brown*, 851 F.2d at 616–17, 620 (distinguishing question of court's appellate jurisdiction and questions appropriate for review).
After *Anderson*, some forms of this defense, beyond the "absence of clearly established duty" argument we recognized in *Chinchello*, may fall within *Mitchell* parameters. We need not and do not decide this issue here. If the actions alleged by plaintiff are not actions that a reasonable official could have believed lawful, *and if defendant claims he took different actions*, which are actions that a reasonable official could have believed lawful, "then discovery may be necessary before [defendant's] motion for summary judgment on qualified immunity grounds can be resolved." 107 S.Ct. at 3042 n. 6. This language demonstrates that raising an "I didn't do [what plaintiff says I did]" defense does not necessarily warrant a denial of summary judgment on the ground that it interjects into the case a material dispute of fact requiring resolution at trial.

■ As we understand Fauver and Call's arguments, however, they are not merely`attempts to show that Fauver and Call did not engage in the alleged violations of Ryan's constitutional rights. They fairly can be described as assertions that (1) Fauver and Call owed Ryan no clearly established duty to take affirmative action to ensure that his constitutional rights were not violated by others and (2) given the information they had, a reasonable official would not have known he was violating Ryan's constitutional rights.[9] Fauver and Call are entitled to review of these arguments before trial. *See Anderson,* 107 S.Ct. at 3039 & n. 2; *Chinchello,* 805 F.2d at 131–32.

### III.

■ The question before us on the merits of Fauver and Call's qualified immunity claim is whether reasonable officials in their positions, with the information then available to them, should have known that their actions or omissions violated clearly established law. *See Anderson,* 107 S.Ct. at 3040; *Lee v. Mihalich,* 847 F.2d 66 (3d Cir.1988). Our review of the legal questions presented on appeal is plenary. *Brown,* 851 F.2d at 617; *Hynson v. City of Chester,* 827 F.2d 932, 934 (3d Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988).

■ Ryan alleges that Fauver and Call violated his liberty interest in personal security and freedom from excessive overcrowding by placing state inmates in the Burlington County Jail despite county officials' stated inability to maintain constitutionally adequate conditions in the presence of this added overcrowding. There is substantial support for the district court's determination that the right of a pretrial detainee to be housed separately from a convicted felon or an inmate known to be dangerous was clearly established in October, 1983. *See, e.g., Youngberg v. Romeo,*

457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982) (right to personal security is substantive liberty interest); *Bell v. Wolfish,* 441 U.S. 520, 535–36, 99 S.Ct. 1861, 1871–72, 60 L.Ed.2d 447 (1979) (pretrial detainee's right to be free from punishment prior to an adjudication of guilt); *Stokes v. Delcambre,* 710 F.2d 1120, 1124 (5th Cir.1983) (pretrial detainee's right to be protected from injury clear since 1979); *Jones v. Diamond,* 636 F.2d 1364 (5th Cir.) (en banc) (excessive overcrowding and attendant deterioration in living conditions constitutes punishment of pretrial detainees; confining pretrial detainees indiscriminately with convicted persons is constitutional violation unless necessary to maintain security or physical facilities do not permit their separation), *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981), *overruled in part on other grounds, International Woodworkers of America Local No. 5-376 v. Champion Int'l Corp.,* 790 F.2d 1174, 1175 (5th Cir. 1986) (en banc); *Curtis v. Everette,* 489 F.2d 516 (3d Cir.1973) (prisoner's liberty interest in personal security), *cert. denied,* 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974).

Fauver and Call propose alternative grounds for their immunity from suit. First, they claim that as a matter of law they are immune because they were not responsible for the day-to-day administration of the Burlington County Jail and cannot be held accountable for the actions of those who were so charged. They also contend that under the circumstances of this case, they lacked sufficient knowledge of conditions at the county jail to have known that their actions violated clearly established law.

While resolution of the question of an official's qualified immunity often turns on whether plaintiff has shown a clearly established right, it may also depend upon

---

**9.** To the extent that these arguments raise issues that go to the merits of Ryan's § 1983 claim, we do not reach them on this appeal. *See infra* typescript at 1206–07, 1209. We note that the burden of establishing qualified immunity is on the defendant official, but the burden of estab-

lishing duty and causation on the merits is on the plaintiff. If an official establishes the former, he escapes trial. If he fails to meet that burden he may still escape liability if the plaintiff fails to meet his burden at trial.

the complementary question whether defendant had a clearly established duty towards plaintiff. *See Hynson,* 827 F.2d at 935; *Chinchello,* 805 F.2d at 131–32. Fauver and Call contend that they had no affirmative duty to ensure that Ryan's rights were not violated by others under *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed. 2d 561 (1976), as explained by this court in *Chinchello.* They also contend that they have no direct authority over county officials, and that county officials alone are responsible for the care, custody and control of inmates in county jails. *See, e.g.,* N.J.Stat.Ann. §§ 30:1–16, :8–17, :8–19, :8–57 (West 1981); *MacNeil v. Klein,* 141 N.J. Super. 394, 358 A.2d 488 (App.Div.) (prison administrators, not county officials, were appropriate codefendants in plaintiffs' civil rights action), *cert. denied,* 72 N.J. 455, 371 A.2d 60 (1976).

In making these arguments, Fauver and Call misread the district court's opinion and ignore the import of Executive Order No. 106, signed by then Governor Byrne in June of 1981. That order acknowledges that penal and correctional institutions in New Jersey are "seriously overcrowded" and that "there is a need to efficiently allocate inmates of state and county penal and correctional institutions to those institutions having available space in order to alleviate overcrowding." App. at 47a. It declares a state of emergency in these state and county facilities and directs the following:

> 3. I hereby DIRECT that the authority to designate the place of confinement of all inmates confined in all State and County penal or correctional institutions shall be exercised for the duration of this Order by the designee of the Governor.
>
> 4. I hereby designate the Commissioner of the Department of Corrections to effectuate the provisions of this Order.
>
> 5. The Commissioner may designate as a place of confinement any available, suitable, and appropriate institution or facility, whether owned by the State, a County, or any political subdivision of this State, or any other person, for the confinement of inmates confined in the State and/or County penal or correctional institutions.
>
> 6. When it appears to the satisfaction of the Commissioner that an inmate should be transferred to a penal or correctional institution or facility of the State or the various Counties more appropriate for his needs and welfare, or that of other inmates, or the security of the institution in which he has been confined, he shall be authorized and empowered to designate the place of confinement to which the inmate shall be transferred.
>
> . . . .
>
> 8. I further ORDER that the authority of the Commissioner to designate the place of confinement of any inmate may be exercised when deemed appropriate by the Commissioner regardless of whether said inmate has been sentenced or is being held in pretrial detention except that only persons sentenced to a prison or committed to the custody of the Commissioner may be confined in a State Prison.
>
> 9. The Commissioner of the Department of Corrections shall have full authority to adopt such rules, regulations, orders and directives as he shall deem necessary to effect the above provisions.

*Id.* at 48a–50a. Executive Order No. 106 was held valid by the New Jersey Supreme Court. *Worthington v. Fauver,* 88 N.J. 183, 440 A.2d 1128 (1982). It was continued by Governor Byrne and by Governor Kean through the date of Ryan's injury, October 3, 1983.

The district court acknowledged that Fauver and Call were not explicitly charged with the day-to-day administration of the Burlington County Jail, but held that this did not absolve them of responsibility for county facilities in their implementation of Executive Order No. 106:

> [I]t is absolutely clear that the overriding purpose of Executive Order No. 106 was to create a central authority for all penal institutions in the state. On its face, Executive Order No. 106 referred to the overcrowding problems of both the state and the county facilities and found that

"there is a need to efficiently allocate inmates of state and county penal and correctional institutions to those institutions having available space in order to alleviate overcrowding...." To effectuate this goal, Executive Order No. 106 granted Fauver the authority and power to transfer prisoners from county to county, county to state, and state to county. Call, of course, had the authority to set the number of beds.

*Ryan v. Burlington County*, 674 F.Supp. 464, 480· (D.N.J.1987).

Whether Fauver and Call had a duty towards convicted inmates and pretrial detainees in county facilities under New Jersey law prior to Executive Order No. 106 is irrelevant. Fauver and Call were given authority under Executive Order No. 106 to coordinate housing between state and county facilities and thus to take actions that affected conditions in county facilities. Having exercised their authority, they had to show that their actions were objectively reasonable. Holding them to that objective standard for immunity purposes does not charge them with day-to-day administration of the Burlington County Jail. We reject their argument that they are immune from suit on this basis.[10]

We therefore return to our original formulation of the question on appeal: whether officials in Fauver's and Call's positions in October, 1983 could reasonably have thought that their actions taken with respect to the Burlington County Jail in the implementation of Executive Order No. 106 were lawful, in light of clearly established law and the information Fauver and Call possessed. We will examine only that information which is relevant to the collat-

eral issue of qualified immunity; disputes over facts that concern liability are not material to our review of the denial of a motion for summary judgment based on claimed qualified immunity. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ Fauver and Call do not argue that Ryan's constitutional right to personal security was not clearly established in 1983, nor do they disagree with the district court's conclusion that the right to personal security includes the right of a pretrial detainee to be housed separately from convicted inmates who are known to be dangerous, unless physical facilities do not permit their separation. *See Ryan*, 674 F.Supp. at 478.[11] Fauver and Call do contend that they should be immune from suit because they had no knowledge of the specific conditions at the jail alleged to be unlawful or of Scott's alleged dangerous propensities.[12] On this appeal we do not reach the question of Fauver and Call's lack of knowledge regarding Scott and his violent propensities. The issue before us is whether their failure to take steps to institute a system designed to permit the separation of pretrial detainees from felons, given the information they had, defeats their claim of qualified immunity. Their argument that they did not know about Scott's record of violence may be relevant on the issue of whether they caused Ryan's injuries. The district court's order is interlocutory with respect to its denial of summary judgment on the question of causation.

■ Fauver and Call's suggestion that they did not have sufficient information to

---

**10.** As noted by the district court, the actions or omissions of other defendants may provide a basis for a defense to liability. At trial, Fauver and Call are free to contend, as they did before the district court on their motion for summary judgment, that their actions were not the proximate cause of Ryan's injuries.

**11.** It may be that there were insufficient physical facilities anywhere in New Jersey's state or local penal institutions to permit such classification consistent with other overriding penalogical concerns. If so, Fauver and Call may raise this as a defense to liability at trial.

**12.** The information available to an official is relevant under *Anderson v. Creighton* to the question of whether an official's actions were objectively reasonable. This inquiry into an official's knowledge must not be confused with the factual inquiry relevant on the liability issue of *mens rea*. The official's state of mind is not a factor in determining whether he is immune from suit. *Harlow v. Fitzgerald*, 457 U.S. 800, 815–17, 102 S.Ct. 2727, 2736–38, 73 L.Ed.2d 396 (1982).

have known, under the "reasonable official" standard, that their actions would violate Ryan's constitutional rights is not supported by the record. They do not (and could not, on this record) claim to have been unaware of the fact that the county jail was overcrowded. After the issuance of Executive Order No. 106, Call continued to monitor county intake of state-sentenced prisoners and also sat as chairman of the classification committee for the assignment of inmates to county facilities throughout the state. App. at 862a. He communicated with Burlington County Jail personnel on a weekly basis. *Id.* at 859a–60a. When asked what program he developed for the intake of state prisoners at the Burlington County Jail, Call responded:

A. I based the quotas that I gave to the county on a weekly basis on telephone communications with practically all of the counties, and with my experience and knowledge from our conversations I determined those counties which I felt needed any help, could have been on a special basis such as escape risks or serious offenses, many times medical. We made exceptions for that type but through my conversations I tried to assess the need for all—you know, for the counties and with what I had available, the bed spaces I had available I issued certain quotas until I kept them all filled.

Q. Other than the telephone conversations with people from the county jails and other than knowing what openings there were in the state institutional system did you rely upon any other information or input to decide what quotas you assigned to what counties on any given week?

A. I relied on any information that would have been brought to my attention by any other staff including county services or any staff that may have been in the county jails to perform other functions. If they had information for me I tried to put it all in the mix and tried to evaluate where I felt the need was the most eminent [sic].

*Id.* at 862a–63a. Call also testified that he knew the Burlington County Jail and others were overcrowded. *Id.* at 865a–66a.

On November 24, 1981, Assistant Burlington County Solicitor Hogan wrote to Fauver regarding the state inmate population at the county jail:

I am writing to you on behalf of the Board of Chosen Freeholders of the County of Burlington concerning our Jail inmate population at our Grant Street facility in Mount Holly, New Jersey. As you may know, Burlington County is under a Federal Court Order which in part directs that the inmate population be reduced over a period of time to 117 inmates. At the time of the Order, the inmate population was averaging between 125 and 135 inmates and the 117 goal seemed feasible.

Our state prison holdovers at that time were negligible. However, since the entry of the Federal Order, our inmate population has soared to a point that it is running at approximately 170 inmates on an average day. Also state prison holdovers now average 20 to 22 persons of that population.

. . . .

Burlington County is earnestly trying to comply with the Federal Order. I would like to request that the Department of Corrections assist in this task by expediting the removal of state prisoners from our facility. Since the state prison population has risen so drastically in the last month, the potential of a major disaster in the prison has also increased. The Burlington County Jail is not a maximum security facility and does not have the proper physical plant to maintain this large number of state inmates.

We are aware of the Governor's executive order and the statewide overcrowding emergency. The Freeholders believe that the Federal Order cannot be ignored however and that the Department of Corrections should do everything possible in conjunction with the efforts of the County to lower this population. By the state expediting the removal of state inmates, there will be considerable

relief of our high prison population.... It is obvious that the natural result of these efforts will be to alleviate what is fast becoming a dangerous overcrowding situation.

*Id.* at 275a–76a. Fauver sent Call a copy of his response to Hogan's letter, which acknowledged "the Federal Court Order under which [Burlington County was] operating and your request that we expedite the removal of approximately 22 State-sentenced inmates who are contributing to the overcrowding at the Burlington County Jail." *Id.* at 277a, 869a.[13] Fauver offered assistance "on at least a piecemeal basis." *Id.* at 277a.

Hogan wrote to Fauver on November 23, 1982, again citing the limitations of the county jail's physical plant and stating that a reduction in the jail population would bring the jail within constitutional standards. *Id.* at 279a–80a. In addition, the County Jail Inspection Reports for the years 1980 through 1983 note various deficiencies in the Burlington County Jail physical plant[14] and state that the limited facilities at the Burlington County Jail preclude the possibility of effective classification with regard to inmate housing assignments. *Id.* at 217a–73a.[15] In litigation to which Fauver was a party, this court indicated that removal of state prisoners would

be required as a constitutional remedy if conditions in a county jail which housed state inmates pursuant to Executive Order No. 106 could not otherwise be rendered constitutional. *Union County Jail Inmates v. Di Buono,* 713 F.2d 984, 1002 (3d Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984).[16]

Although the cases cited earlier with respect to the rights of inmates, with the exception of *Union County,* do not involve officials in the precise positions held by Fauver and Call, the standard to which we look in determining the clarity of the constitutional right allegedly violated by an official states that the contours of that right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 107 S.Ct. at 3039. This does not mean, however, that an official will be protected from suit "unless the very action in question has previously been held unlawful"; rather, the unlawfulness must be "apparent" in light of existing law. *Id.* This standard requires "some but not precise factual correspondence" between relevant precedents and the conduct at issue. *People of Three Mile Island v. Nuclear Regulatory Comm'rs,* 747 F.2d 139, 144 (3d Cir.1984). "Although officials need

---

13. On October 3, 1983, the date on which Ryan was injured, there were 141 inmates housed in the Burlington County Jail; 117 were county inmates and 24 were state-sentenced inmates. *See Ryan,* 674 F.Supp. at 474. During the months of September and October, 1983, Call directed the removal of 8 county and 3 state-sentenced inmates from the Burlington County Jail. *See* App. at 167a–68a.

14. Among the deficiencies enumerated were: (1) the cells were too small; (2) lighting was inadequate; and (3) there was no space for indoor or outdoor recreational activities. The Reports also document deficiencies in services to inmates. For example, there were no educational programs and library services were limited. App. at 217a–31a (1980); 235a–53a (1982); 258a–73a (1983). The report dated February 16, 1983 notes that many of the cells were overcrowded. *Id.* at 260a.

15. These annual reports were forwarded to Fauver. He testified that he would read the report summations if the report stated that re-inspection was necessary. App. at 731a. Such follow-up inspections were conducted in 1981 and

1982; the cover letter to the 1983 annual inspection states that there would be a follow-up inspection. Fauver's testimony thus shows that he would have read the summaries in the annual reports for the years 1980 (*id.* at 230a–31a), 1982 (*id.* at 251a–53a) and 1983 (*id.* at 272a–73a).

16. In *Union County,* inmates of the Union County Jail brought a civil rights action against various judges, administrators of the jail and county officials. The county filed a third-party complaint against Commissioner Fauver. In it, they attributed "any unconstitutionality of conditions at the Jail to overcrowding resulting from the refusal of the Commissioner to accept for custody those prisoners who had been sentenced to state prison." *Union County,* 713 F.2d at 987. This court concluded that Commissioner Fauver's remedial scheme would cure the existing constitutional violations at the county jail and, accordingly, reversed the district court's order directing removal of state prisoners from the county facility. *Id.* at 1002–03.

not 'predic[t] the future course of constitutional law,' they are required to relate established law to analogous factual settings." *Id.* (citations omitted). On this record, the contours of Ryan's rights were clear.

Considering the information available to Fauver and Call, no official of their stature could reasonably have thought that continuing to place state inmates in the Burlington County Jail with no more than an *ad hoc* system for their removal was lawful. Whether Fauver and Call are liable under § 1983 for the injury sustained by Ryan is an issue for trial. At that time, Fauver and Call may raise their claim that they lacked any information about Scott, a question that we cannot resolve on this appeal because it is germane to the merits of Ryan's § 1983 claim rather than the issue of qualified immunity now before us.

### IV.

For the foregoing reasons, we will deny Ryan's motion to dismiss this appeal and will affirm the order of the district court denying summary judgment on the grounds of qualified immunity. We will remand this case for further proceedings consistent with this opinion.